UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

XXIII CAPITAL LIMITED,

              Plaintiff,

  v.

DECADE, S.A.C., LLC, DECADE, S.A.C.
CONTRACTS, LLC, DECADE, S.A.C. I, LLC,
DECADE, S.A.C. II, LLC, DECADE, S.A.C. III,
LLC, GOODWIN ASSOCIATES MANAGEMENT
ENTERPRISES, INC., GOODWIN SPORTS
MANAGEMENT, INC., DECADE, S.A.C.
EXECUTIVES, LLC, GOTHAM S&E HOLDINGS,
LLC, CHRISTOPHER ADEN, DORSEY JAMES,
AARON GOODWIN, and ERIC GOODWIN,

              Defendants

No. _____

**COMPLAINT**

Plaintiff XXIII Capital Limited ("XXIII" or Plaintiff"), by and through its counsel, Loeb & Loeb LLP, brings this action against defendants Decade, S.A.C., LLC ("Decade, S.A.C."), Decade, S.A.C. Contracts, LLC ("Decade Contracts"), Decade, S.A.C. I, LLC ("Decade I"), Decade, S.A.C. II, LLC ("Decade II"), Decade, S.A.C. III, LLC ("Decade III"), Goodwin Associates Management Enterprises, Inc. ("GAME"), Goodwin Sports Management, Inc. ("GSM"), Decade, S.A.C. Executives, LLC ("Decade Executives"), Gotham S&E Holdings, LLC ("Gotham") (collectively, "Decade"), Christopher Aden ("Aden"), Dorsey James ("James"), Aaron Goodwin, and Eric Goodwin (together with Aaron Goodwin, the "Goodwins," and collectively with Aden, James, and Decade, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.     This action stems from Defendants' wrongful and unjustified diversion of funds – all of which are collateral over which Plaintiff has a first priority, perfected security interest and lien, and all of which were required under the loan agreement to be deposited directly and

exclusively into a lockbox account for Plaintiff's benefit.  Just over 18 months ago, Plaintiff loaned Defendants millions of dollars so Defendants could launch their business.  Now, Defendants hide, divert, secrete and improperly spend the very proceeds from which Defendants agreed Plaintiff would receive repayment.  Shockingly, in barely a year and a half, over $10.1 million that should have been paid into the lockbox has not been deposited.  Certain Defendants have admitted that they have kept the funds for themselves, and all Defendants have used funds for other prohibited purposes.  Worse, Defendants have admitted that they explicitly instructed the payors of the funds (the obligors on receivables pledged to Plaintiff) to disobey notices sent by Plaintiff as secured creditor.  Defendants have even admitted that they knew before accepting Plaintiff's loan that certain proceeds would not be paid.  Perhaps most egregiously, Defendants improperly and clandestinely utilized non-lockbox accounts to make substantial payments to themselves, and have now, in anticipation of this litigation, fully depleted not only the lockbox but also all of their other corporate accounts.  The situation continues to deteriorate, and Defendants have admitted that they have no intention of paying the proceeds into the lockbox or surrendering Plaintiff's proceeds collateral to Plaintiff.

2.    Inclusive of principal, accrued interest, administrative fees, attorneys' fees and expenses, and other costs, Defendants currently owe Plaintiff over $22 million (the "Indebtedness"), and interest continues to accrue on a daily basis.  The Indebtedness is past due, and payable in full, without discount or any reduction, from each of Decade, Aden, and James, jointly and severally.

3.    In February 2016, Plaintiff XXIII financed Decade's acquisition of several sports agencies, including GAME and GSM, in a series of integrated transactions (the "Transactions") which formed the heart of Decade's business plan.  Defendants Eric and Aaron Goodwin had wholly owned these two agencies and sold all of their shares in them to the other Decade

2

Defendants..  Upon the sale, the Goodwins received handsome, multi-million dollar payouts and took positions as highly compensated senior employees of Decade.  XXIII financed all of these Transactions, providing Decade with a loan facility of $20 million.

4.     When a sports agency like GAME or GSM brokers an employment or endorsement contract on behalf of a professional athlete, the agency typically receives periodic commission payments as the athlete's salary and endorsements are paid.  Those periodic amounts form a stream of payments on receivables which, in these Transactions, constituted the primary monetary assets of the sports agencies that Decade was acquiring (such receivables and payments, the "Payments").  Accordingly, in exchange for its loan, XXIII received a first priority security interest in and lien on those Payments.  In addition, the agreement between Decade and XXIII (the "Loan Agreement") required Decade to instruct certain athletes to make Payments directly and exclusively into one or more designated lockbox accounts (the "Lockbox"), from which XXIII would receive its loan servicing payments first, before any additional revenue was distributed (if at all) to Decade or other parties, including Decade's employees.  If any of the athletes failed to comply, Decade itself was required to deposit the Payments directly and exclusively into the Lockbox.

5.     Defendants have ignored these obligations and instead have diverted more than three quarters of the Payments that should have been paid into the Lockbox in the 18 months since the Loan Agreement was signed and XXIII made the multi-million dollar loan to Decade. Aaron Goodwin and other executives of Decade, including Aden and James, have admitted that (i) the professional athletes represented by GAME and GSM (formerly the Goodwins' companies) (the "Athletes") have continued to make Payments to accounts controlled by Aaron Goodwin, just as they did before the Transactions; (ii) Aaron Goodwin has intentionally and knowingly retained the majority of those Payments, forwarding less than a third to Decade; (iii)

Decade has used Payments for its own purposes, including paying its executives' substantial compensation; and (iv) neither the Goodwins nor Decade have transferred Payments into the Lockbox, all in blatant violation of the Goodwins' and Decade's obligations under the agreements supporting the Transactions.

6.     In short, Decade and its executives, including the Goodwins, have intentionally subverted the Lockbox and have retained XXIII's money for themselves.  None of the Athletes deposited their Payments to the Lockbox as instructed.  After months of non-payment, XXIII sent a default notice to Decade in December 2016 and, after Decade *also* missed an interest payment and breached performance covenants requiring minimum deposits in the Lockbox, XXIII sent an acceleration notice in March 2017.  In addition, after delivering the acceleration notice to Decade, XXIII sent certain Athletes written direction to make their Payments directly to XXIII.  None of these steps changed the situation, and the Athletes made their Payments neither into the Lockbox nor into the account that XXIII had identified in its letter – because, as Aaron Goodwin has boldly admitted, he explicitly told the Athletes to ignore these instructions, in gross violation of his and Decade's obligations.

7.     Decade, for its part, has also refused to deposit Payments into the Lockbox, and has refused to compel the Goodwins – who are executives of Decade as a result of the Transactions – to do so either.  Moreover, Decade itself has further violated its obligations under the Loan Agreement by failing to direct to the Lockbox even the limited Payments that the Goodwins did forward to it.

8.     After nearly 18 months, in late July 2017, Decade admitted to XXIII that the problem did not lie entirely with the Goodwins' refusal to honor the Lockbox.  In some situations, certain of the Athletes had breached their underlying contracts even before Decade had acquired GAME, GSM, and the other agencies.  Decade was therefore aware at the time that

4

it entered into the Transactions that the Payments from those Athletes would not be made.  But Decade never disclosed that fact to XXIII before the Transactions were entered into, nor for nearly 18 months afterwards, and instead misrepresented that these Payments would be collectible.  This breach of representations and warranties also meant that Decade was in default under the Loan Agreement from its inception.

9.      Finally, in September 2017, XXIII learned for the first time that Decade has engaged in other malfeasance, in gross violation of its contractual obligations.  Decade has been improperly and clandestinely utilizing its operating accounts, into which funds were supposed to flow only *after* being paid into the Lockbox (if at all), to receive Payments from Aaron Goodwin, and to make substantial payments to Aden, James, and the Goodwins, as well as to entities entirely unknown to XXIII, all in derogation of XXIII's contractual and collateral rights.  In addition, XXIII learned that Decade had obtained additional loans from other lenders after the Transactions, and paid those lenders back, all without XXIII's knowledge or consent, constituting yet another breach of Decade's agreements with XXIII.

10.     Most problematically, the situation continues to worsen.  Both Decade and the Goodwins still refuse to honor the Lockbox, with Aaron Goodwin going so far as to inform XXIII that it is their intention to ignore it entirely.  Decade has proven itself unwilling to, or incapable of, taking any corrective action.  The result is that Decade has been in continuous default of its payment obligations to XXIII almost since inception, and, in light of XXIII's acceleration of the loan, now owes XXIII the full Indebtedness.  Worse yet, in the months leading up to this litigation, Decade has zeroed out all of its corporate accounts, indicating either that it is insolvent, or that it is secreting its assets in anticipation of litigation, or both.

## THE PARTIES

11.     Plaintiff XXIII is a corporation incorporated in the United Kingdom and with a

principal place of business in the United Kingdom.

12.     Upon information and belief, Defendant Decade, S.A.C., LLC is a Delaware limited liability company with a principal place of business in New York, New York.

13.     Upon information and belief, Defendant Decade, S.A.C. Contracts, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Decade, S.A.C.

14.     Upon information and belief, Defendant Decade, S.A.C. I, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is a majority-owned subsidiary of Defendant Decade, S.A.C.

15.     Upon information and belief, Defendant Decade, S.A.C. II, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Decade, S.A.C.

16.     Upon information and belief, Defendant Decade, S.A.C. III, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is a majority-owned subsidiary of Defendant Decade, S.A.C.

17.     Upon information and belief, Defendant Goodwin Associates Management Enterprises, Inc. ("GAME") is a California corporation with a principal place of business in Oakland, California, and is a wholly-owned subsidiary of Defendant Decade Contracts.

18.     Upon information and belief, Defendant Goodwin Sports Management, Inc. ("GSM") is a Washington corporation with a principal place of business in Seattle, Washington, and is a wholly-owned subsidiary of Defendant Decade Contracts.

19.     Upon information and belief, Defendant Decade, S.A.C. Executives, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Decade, S.A.C.

20.     Upon information and belief, Defendant Gotham S&E Holdings, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and has a 100% membership interest in Defendant Decade, S.A.C.

21.     Upon information and belief, Defendant Christopher Aden ("Aden") is a citizen and resident of New Jersey and an executive of Defendant Decade, S.A.C.

22.     Upon information and belief, Defendant Dorsey James ("James") is a citizen and resident of New Jersey and an executive of Defendant Decade, S.A.C.

23.     Upon information and belief, Defendant Aaron Goodwin is a citizen and resident of Washington State and is an employee of Defendant Decade Executives.

24.     Upon information and belief, Defendant Eric Goodwin is a citizen and resident of California and is an employee of Defendant Decade Executives.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest.

26.     Venue is proper in this Court because (a) upon information and belief, Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, Decade Executives, and Gotham all have their principal places of business in this District; (b) upon information and belief, Defendants Aden and James both conduct business in New York State; (c) a substantial part of the events or omissions giving rise to the claims occurred in New York State, including multiple in-person meetings among the parties related to the actions and omissions described herein; and (d) each party signed one or more of the transactional documents that govern this case, those governing transactional documents form an integrated whole, and each of those governing transactional documents contains a forum selection clause providing that jurisdiction

over any disputes shall lie exclusively in the federal and state courts located in New York County, New York.

**FACTUAL ALLEGATIONS**

**A.      XXIII Finances Decade's Acquisition of GAME and GSM**

27.      On or about February 22, 2016, various parties executed 56 documents which were integrated together under the title "Closing Documents XXIII Capital Limited Financing of Borrowers with Respect to Acquisitions of SMP, GAME, GSM, and Encore."  Through these Transactions, XXIII loaned $16 million cash to Decade, and extended an additional $4 million of credit, all on a secured basis, to finance Decade's acquisition of sports agencies, including GAME and GSM.

28.      The Closing Documents included, among other things:

- The Loan, Guaranty and Security Agreement (the "**Loan Agreement**"), a copy of which is annexed hereto as Exhibit A, through which XXIII provided financing to Decade and obtained a perfected security interest and lien.
- The Share Purchase Agreement, (the "**Share Purchase Agreement**"), a copy of which is annexed hereto as Exhibit B, through which the Goodwins sold their interests in GAME and GSM to Decade Contracts and Decade, S.A.C.
- Executive Employment Agreements that Decade entered into with Aaron Goodwin and Eric Goodwin (each, an "**Executive Employment Agreement**"), copies of which are annexed hereto as Exhibits C and D, and which set forth the terms of the Goodwins' employment with Decade upon the sale of GAME and GSM.

**i.      The Loan Agreement**

29.      The Loan Agreement was executed by the following parties: (a) Decade, S.A.C, Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM, as Borrowers; (b) Aden and James as Personal Guarantors; (c) Decade Executives and Gotham as Corporate Guarantors; and (d) XXIII, as Lender.

30.      Pursuant to section 2.1(a) of the Loan Agreement, XXIII agreed "to make a term loan to Borrowers in the principal amount of $20,000,000."  Section 2.3(a) authorized XXIII to

hold back approximately $5.5 million of that sum and apply it to cover Decade's required repayments of principal and interest.  XXIII in fact held back $4 million and disbursed $16 million to Decade.  XXIII later applied the $4 million holdback to Decade's required repayments and in reduction of the outstanding obligations under the Loan Agreement.

### (a)        Payments Must Be Directed Into the Lockbox

31.     To ensure timely payment of principal and interest on the loan, the Loan Agreement requires Decade to direct Payments solely to one or more "Lockbox Accounts" into which Payments would be deposited.  First, the Loan Agreement defines contracts between the agencies and the Athletes, pursuant to which such Payments would be paid, as "Covered Agreements."  Pursuant to section 4.18 of the Loan Agreement, each Borrower is required to deliver copies of all such Covered Agreements to XXIII.  Annex A-1 of the Loan Agreement lists all Payments due to each Borrower under the Covered Agreements.

32.     Next, Decade represented and agreed in the Loan Agreement that it "shall maintain . . . the Lockbox Accounts until the Termination Date," and, with certain defined exceptions, "[n]o Borrower maintains any bank accounts other than . . . the Lockbox Accounts." Exhibit A at § 4.14; *see also id.* § 7.14.  Section 6.7(a) of the Loan Agreement further provides that "each Loan Party [i.e., Borrower or corporate guarantor] shall . . . execute and deliver to each Obligor [i.e., the Athletes or other counterparties to the Covered Agreements] an Irrevocable Direction Letter pursuant to which such Loan Party shall irrevocably direct such Obligor . . . to make all payments due and owing to such Loan Party pursuant to such Covered Agreements into a Lockbox Account."  Section 6.7(a) continues:

> If, notwithstanding the foregoing instructions, any Loan Party receives any payments from an Obligor, such Loan Party shall immediately deposit same to a Lockbox Account.  Until so deposited, such Loan Party shall hold all such payments in trust for and subject to the Lien in favor of Lender and shall not commingle such payments with any of its other funds or property.

33.     In other words, Decade is required to inform any Athletes who are or become its clients as a result of the Transactions that the Athletes must make their periodic commission Payments only and directly into the Lockbox.  If any Athlete nevertheless make such Payments to Decade instead, Decade must deposit those Payments into the Lockbox immediately.  *Id.  But while Decade may have sent the required notices, it continued receiving Payments and did not deposit them into the Lockbox.*

34.     XXIII maintains full dominion and exclusive control over the Lockbox.  *Id.* § 6.7(b).  Moreover, sections 6.7(b) and (c) of the Loan Agreement require Decade to inform any relevant financial institutions of the Lockbox, and to instruct any financial institution that houses the Lockbox to comply with XXIII's instructions.

### (b)      Decade Provides a Security Interest and Lien to XXIII

35.     To secure the payment of the Indebtedness, Decade granted to XXIII a first priority security interest in and lien on virtually all of Decade's assets, including, among other things, its "Accounts," "Records," "Documents," "General Intangibles," "Instruments," "money," "books and records," and "Proceeds" (collectively, the "Collateral").  Exhibit A at § 9.1(a); *see also id*. §§ 9.2, 9.4(b), 9.5(e).  This definition includes the Payments and all Covered Agreements.

### (c)      Decade Executives, Gotham, Aden and James Guarantee Decade's Obligations

36.     In addition to the Decade entities which signed the Loan Agreement as Borrowers, Decade Executives and Gotham signed as corporate guarantors (the "Corporate Guarantors").  Decade's principals, Aden and James, also signed as personal guarantors (the "Personal Guarantors," and together with the Corporate Guarantors, the "Guarantors").

37.     Pursuant to section 14.1 of the Loan Agreement, each of the Guarantors agreed jointly and severally to guarantee the prompt payment of the Indebtedness, in addition to all

reasonable costs and fees incurred by XXIII in endeavoring to collect upon any of the obligations from any of the Borrowers or Guarantors.  *See* Exhibit A at §§ 14.1, 14.2, 14.3.  XXIII is not required to assert any claim or demand as a prerequisite to enforcing the guaranty. *Id*. § 14.3(c).

### (d)   Decade Provides Other Protections to XXIII

38.   The Loan Agreement includes other clauses intended to further protect XXIII and its rights and interests.

39.   Under section 4.13 of the Loan Agreement, Decade promised to be forthright and to provide accurate information to XXIII, representing that none of the information that had been or would be delivered to XXIII "contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein . . . not misleading in light of the circumstances under which they were made."

40.    Section 2.10 requires Decade to allow XXIII to review Decade's books and records and to inspect and evaluate its Collateral.

41.   Pursuant to section 9.6, Decade grants to XXIII a power of attorney "to take any and all appropriate action . . . which Lender reasonably deems necessary" in an Event of Default as defined in the Loan Agreement.

42.   If an Event of Default occurs, XXIII may declare immediately due and payable the entire unpaid balance remaining under the Loan Agreement, together with interest, administrative fees, attorneys' fees and expenses, and other costs. *See* Exhibit A at § 10.2(a).

43.   Upon an Event of Default, XXIII also has the right to take immediate possession of the Collateral, and Decade must make the Collateral available to XXIII.  *Id*. § 10.2(c).

44.   The Loan Agreement also requires Decade to pay XXIII's expenses, including legal fees, incurred in connection with enforcing XXIII's rights.  *Id*. §§ 13.3, 14.1.

45.   The Loan Agreement contains a New York choice of law provision and a New

York County forum selection clause. *Id*. § 13.7. The other relevant Transaction documents contain substantially identical clauses. *See* Exhibit B at §§ 12.5, 12.6; Exhibit C at § 15; Exhibit D at § 15.

### ii.     The Share Purchase Agreement

46.     As part of the same set of Transactions, GAME, GSM, and the Goodwins entered into the Share Purchase Agreement with Decade Contracts and Decade, S.A.C. *See* Exhibit B.

47.     The Share Purchase Agreement recites that Aaron Goodwin owned 100% of the capital stock of GAME, and Eric Goodwin owned 100% of the capital stock of GSM. Exhibit B at 1 (Recitals). Pursuant to the Share Purchase Agreement, the Goodwins sold all of the shares of GAME and GSM to Decade Contracts, making Decade Contracts "the sole shareholder of each of GAME and GSM." *Id*. § 2.1; *see also id*. at Signature Page (signed by each of the Goodwins "as an individual"). The Share Purchase Agreement recites that Decade paid the Goodwins a purchase price of $35 million, consisting of a payment upon closing of $9.5 million – loaned by XXIII – and a $25.5 million promissory note. *Id*. §§ 2.2, 2.3.

48.     In addition, the Share Purchase Agreement provides that "Sellers" could become entitled to "contingent consideration," consisting of certain percentages of the proceeds of certain receivables (i.e., Payments), if no Event of Default occurred under the Loan Agreement and if certain other conditions were met. *Id*. § 2.4. Because the conditions were never met, and such an Event of Default subsisted virtually since the Transactions' closing, no contingent consideration has ever been due.

49.     The Share Purchase Agreement, like the Loan Agreement, requires that if GAME,GSM, or either of the Goodwins receive any money which should have been sent to XXIII, they must deliver it to XXIII, which is explicitly named as a "third party beneficiary." *Id*. §§ 2.4, 12.2.

### iii.   The Executive Employment Agreements

50.     Finally, Decade Executives signed Executive Employment Agreements with both Aaron Goodwin and Eric Goodwin.  *See* Exhibits C and D.  Pursuant to those agreements, Decade employed the Goodwins as Senior Managing Partners.  *See* Exhibit C at §§ 1, 2; Exhibit D at §§ 1, 2.

51.     Under their Executive Employment Agreements, the Goodwins must "devote all of [their] business time and attention, best efforts, and all of [their] skill and ability to promote the interests of [Decade]," and "serve [Decade] faithfully and diligently."  Exhibit C at § 1; Exhibit D at § 1.  The agreements list several grounds for termination, including the Goodwins' "failure or refusal to materially perform the duties and responsibilities of [their] position[s]" and "the willful misappropriation of the funds or property of [Decade]," as well as Decade's "inability . . . to collect material revenue to which it believes it was entitled to [sic] from [the Goodwins'] clients, and in particular, Demar DeRozen and Damian Lillard."  Exhibit C at § 4(c); Exhibit D at § 4(c).

### B.   XXIII Perfects Its Security Interests in the Collateral

52.     XXIII has perfected its security interests in the Collateral including by filing UCC-1 financing statements.

53.     XXIII's properly perfected, first priority security interest in the Decade, S.A.C. Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

54.     XXIII's properly perfected, first priority security interest in the Decade Contracts Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

55.     XXIII's properly perfected, first priority security interest in the Decade I

Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

56.     XXIII's properly perfected, first priority security interest in the Decade II Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

57.     XXIII's properly perfected, first priority security interest in the Decade III Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

58.     XXIII's properly perfected, first priority security interest in the GAME Collateral is evidenced by the UCC-1 financing statement filed with the California Secretary of State on February 22, 2016.

59.     XXIII's properly perfected, first priority security interest in the GSM Collateral is evidenced by the UCC-1 financing statement filed with the Washington Department of Licensing on February 22, 2016.

60.     XXIII's properly perfected, first priority security interest in the Decade Executives Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

61.     XXIII's properly perfected, first priority security interest in the Gotham Collateral is evidenced by the UCC-1 financing statement filed with the Delaware Secretary of State on February 22, 2016.

C.     **Defendants Default on Their Repayment Obligations**

62.     Defendants have breached the Loan Agreement by misdirecting Payments away from the Lockbox.  Defendants have also defaulted under the Loan Agreement by failing to deposit into the Lockbox the required minimum amounts and by failing to make a required

14

interest payment.  Over the 18 months since the Transactions closed, more than $11.55 million of Payments should have been deposited into the Lockbox.  As of this date, Defendants have deposited only $1.462 million into the Lockbox, leaving a glaring shortfall of approximately $10.1 million.

<b>i.      Defendants Divert Payments from the Lockbox</b>

63.     On or about May 27, 2016, after the closing of the Loan Agreement, and as provided for in section 6.7(a) thereof, upon information and belief, Decade sent direction letters to certain of the Athletes represented by GAME and GSM, informing the Athletes that, from that point forward, they were required to make all Payments to the Lockbox.  Despite these letters, the recipients never made _any_ Payments into the Lockbox.

64.     Annex A-1 of the Loan Agreement, which was prepared based on the Covered Agreements and the related information provided by Defendants, reflected that there was a total of $5,499,799 owed under existing Covered Agreements at closing, and projected revenue of $3,807,950 for fiscal year 2015-2016 alone.  However, none of those anticipated Payments were paid into the Lockbox as required.

65.     For months, Decade gave false and misleading explanations of why funds were not being deposited into the Lockbox, often assuring XXIII that funds would be coming once certain Athletes received their endorsement payments and/or paid their required commissions to GAME or GSM.  In fall of 2016, for example, Decade represented that a number of outstanding GAME and GSM receivables would soon be collected and paid into the Lockbox.  And, in subsequent months, Decade repeatedly stated that Payments were expected imminently.

66.     On occasion, and only upon direct and persistent demand by XXIII, Decade itself would deposit certain funds into the Lockbox.  Of course, these funds could have come from any source, and these amounts never equaled – or even approached – the totals expected in the

Lockbox pursuant to Annex A-1 of the Loan Agreement.

67.     Despite the fact that no Payments were being made into the Lockbox, in early October 2016 Decade requested from XXIII the release of funds, which were being held in reserve pursuant to the Loan Agreement, purportedly to cover operating expenses for the remainder of 2016.  Ex. A at § 2.3(a).  Under no obligation to do so, and skeptical of the reason for Decade's request, XXIII declined to release the funds.  Decade – without notifying XXIII – then turned to the Lockbox to make up the shortfall.  Decade convinced JPMorgan Chase, where the Lockbox accounts are held, to release funds, despite the fact that XXIII's consent was required for any such withdrawal.  Once XXIII learned of Decade's actions, XXIII protested to JPMorgan Chase, which immediately prevailed upon Decade to return the withdrawn funds.

68.     $2.5 million of Payments were owed by a professional baseball player to SMP Sports LLC ("SMP"), another sports agency (unrelated to the Goodwins) which Decade also purchased as part of the Transactions; the player asserted claims against SMP, which settled those claims in exchange for a discount from $2.5 million to approximately $1.5 million in commission payments, even though those commission payments were no longer SMP's property and should not have been discounted without Decade's and XXIII's approval.

### ii.      XXIII Sends a Default Notice, But Defendants Continue to Breach the Lockbox Obligation

69.     On December 7, 2016, XXIII sent Decade a letter documenting that "payments are being paid directly to the Loan Parties and the Loan Parties are not depositing such payments into a Lockbox Account."  XXIII "demand[ed] that all such payments . . . be immediately remitted to a Lockbox Account."  XXIII also informed Decade that its "failure to comply with section 6.7(a) of the Loan Agreement as a result of the Loan Parties not depositing payments received by Obligors into a Lockbox Account constitutes an Event of Default."  This December 7, 2016 default letter is annexed hereto as Exhibit E.

16

70.     XXIII's demand for payment was never satisfied.   Even after receiving the December 7, 2016 default notice, Defendants continued to divert Payments from the Lockbox.

### iii.     Decade Sends an Acceleration Notice and Direction Letters

71.     The Loan Agreement required Decade to ensure that the Lockbox received certain minimum Payments pursuant to the schedule contained at Annex A-1; if such sums were not received, Decade was required to make payment of that amount itself.   *See* Exhibit A at §§ 2.7(a), 7.13(a), Annex A-1.   Pursuant to a revised schedule provided by Decade in May 2016, $6,360,000 was due into the Lockbox on February 28, 2017, meaning that Decade needed to pay in $4,890,000 to account for the shortfall.   Decade made no such payment.

72.     On March 15, 2017, Decade was obligated to make an interest payment of $539,726.80.   Exhibit A at §§ 1 (definitions of "Interest Rate" and "Interest Payment Date"), 2.4(a).   Decade failed to make such payment.

73.     On March 21, 2017, XXIII sent Decade a second letter, which set forth that "the Loan Parties continue to be in violation" of the Loan Agreement "as a result of payments from Obligors not being deposited into a Lockbox Account."   The letter also identified several other Events of Default, including Decade's failure to deposit the required minimum amounts into the Lockbox and Decade's failure to make the interest payment.   This March 21, 2017 letter is annexed hereto as Exhibit F.

74.     As a result of these Events of Default, XXIII, in its March 21, 2017 letter, accelerated the Loan and demanded payment of $20,703,475, representing the full amount of the outstanding obligations at that time.

75.     This demand, too, was never satisfied.   Decade never paid.   Instead, Defendants continued to divert Payments from the Lockbox.

76.     On or about March 29, 2017, and as provided for in sections 9.3 and 10.2 of the

Loan Agreement and U.C.C. Section 9-607, XXIII sent direction letters to certain of the Athletes that were clients of GAME and GSM, informing them that, from that point forward, Payments "should now be made to Lender directly." Despite these letters, the recipients never made any Payments into the designated account set forth in those letters.

77.     From December 2016 through July 2017 alone, over $5.25 million of Payments that were due to be paid directly to the Lockbox went unpaid and unaccounted for.

>    **D.     Decade and Aaron Goodwin Admit to Breaching the Loan Agreement, Including by Purposely Circumventing the Lockbox**

78.     XXIII has had numerous communications with Decade throughout the 18-month period, to try to address Decade's defaults. While XXIII believed Decade to be communicating in good faith about delayed receivables and purportedly imminent Payments, only in mid-2017 did Decade admit to XXIII the full state of affairs, including malfeasance that had been hidden from XXIII since March 2016: Aaron Goodwin, a Decade executive and former principal of GAME, was receiving Payments, retaining a large portion for himself, and then forwarding only a portion to Decade, all in direct and open violation of Defendants' obligation to direct Payments to the Lockbox. Nor did Eric Goodwin, also an executive of Decade and the former principal of GSM, ever intervene to ensure that Payments from the Athletes represented by GSM – including professional basketball players Damian Lillard, DeMar DeRozan and others – were directed to the Lockbox. Millions of dollars of Payments from GSM obligors went missing.

79.     James and Aden were aware of the Goodwins' malfeasance but, for many months, neither James nor Aden was ever forthright about the Goodwins' actions, preferring, instead, to lead XXIII along with false promises. In an April 2017 telephone call with a representative of XXIII, however, Aaron Goodwin openly admitted and confirmed that he had been receiving Payments directly, keeping at least 62.5% of them. He represented that he then forwarded the other 37.5% to Decade (but not to the Lockbox).

80.     Aaron Goodwin further admitted that he had specifically directed the Athletes to *disobey* Decade's and XXIII's Payment direction notices, in direct violation of his obligations under his Executive Employment Agreement and of GAME's and GSM's obligations under the Loan Agreement.  To this end, he had instructed his attorneys or agents to write to the Athletes who had received XXIII's direction letters in March 2017 and instruct them to disregard the directions in XXIII's letters and instead to continue making any Payments directly to him. Aaron Goodwin also openly admitted that he had no intention of ever honoring the Lockbox arrangement.

### i     The Goodwins Improperly Retain a Large Portion of the Payments

81.     Aaron Goodwin's stated belief that he is entitled to keep 62.5% of the Payments is wrong.  He misinterprets section 2.4(b) of the Share Purchase Agreement.  That provision, discussing "contingent consideration" that might be payable to "Sellers" under certain conditions, lists as one such item of contingent consideration 62.5% of "all revenue entitlements from Lillard and DeRozan," who had been two of GAME and GSM's largest clients before the Transactions.

82.     This provision does not entitle the Goodwins to retain 62.5% – or, in fact, any – of the Payments.  Among other things, it is contingent upon a number of conditions being met, including the absence of any defaults under the Loan Agreement, and upon "a designated officer certifying" the same.  The very fact that these Payments were not first deposited into the Lockbox was itself an Event of Default under the Loan Agreement and plainly defeated any right that any "Seller" had to these contingent payments.  In addition, as described below, the loan was in default from day one because of Decade's breaches of its representations and warranties. Accordingly, because the loan was in default for numerous reasons essentially from its inception, this provision could never have been triggered.

19

83.     Section 2.4(b) of the Share Purchase Agreement is facially unambiguous, especially as read in conjunction with the rest of that Agreement and the Loan Agreement. Payments were supposed to be paid into the Lockbox first and only then distributed from there to the various parties as set forth in the Transaction documents – including possibly to "Sellers" under section 2.4(b), but only if all other aspects of the Loan Agreement were being complied with and all conditions precedent were met.  This provision was never an entitlement to self-help on the part of the Goodwins.

84.     As executives of Decade, and pursuant to the Share Purchase Agreement which they each signed personally, both of the Goodwins were on notice of their obligations to honor the Lockbox provisions of the Loan Agreement.  The direction letters that Decade sent to the Athletes in March 2016, and the second set of direction letters that XXIII sent after Decade's default, both reflected the fact that the Payments were exclusively  payable to Decade and, then, to XXIII.   XXIII reiterated its contractual entitlement to the Payments directly to Aaron Goodwin during a telephone conversation in April 2017.  Nevertheless, neither of the Goodwins have ever directed Payments to be remitted to the Lockbox or directly to XXIII.

85.     To date, Decade *admits* that the Goodwins have improperly retained over $7.3 million of Payments; in fact, the total figure appears to be approximately $10.1 million.

               **ii      Decade Improperly Retains a Portion of the Payments**

86.     Decade has offered nothing to XXIII but excuses.  At various points, different Decade representatives blamed the Athletes for not making timely Payments; explained that the Payments were late because that was consistent with the Athletes' previous relationships with GAME and GSM; denied there was a default; admitted that the Payments should have been sent to the Lockbox; admitted that this constituted a default but blamed Aaron Goodwin; stated that they did not have adequate information regarding what funds Aaron Goodwin or Decade had

20

received; and represented that they were attempting to work with Aaron Goodwin to resolve the situation.  None of these statements has resulted in any of the Payments or any other funds being paid into the Lockbox or to XXIII, other than the small sums described above.

87.     No representative of Decade has ever provided any explanation *whatsoever* for why Decade has not forwarded to the Lockbox the portion of the Payments that it admittedly received from the Goodwins.

88.     Rather, Decade admitted that it improperly used these funds for other purposes, including paying its executives' excessive compensation.  For example, James and Aden have been paying themselves, through their individual corporate entities, in regular disbursements of approximately $25,000 per month each; there also was an additional disbursement of $425,000 to Gotham, an entity owned by Aden and James, for unspecified "professional services."  These also included regular monthly payments to Aaron and Eric Goodwin of $15,000 to $17,000 each. Over the course of the loan, there were over $15 million in self-dealing payments.  All of these self-dealing payments occurred while Decade was in severe default of its loan obligations, and were made with XXIII's Collateral.

89.     Decade has provided no explanation for why it has not sought recovery from the Goodwins of the Payments that the Goodwins diverted and withheld and that Decade owes to XXIII, nor of the portion of those Payments that Decade itself might have ultimately received. The reason is clear:  while Decade has at certain points blamed Aaron Goodwin and would like to cast itself as a victim, Decade has clearly sanctioned and gained from its executives' actions, with Aden and James also benefitting personally.  In short, the Defendants all conspired to take XXIII's money.

### iii     Decade Admits to Further Breaches of the Loan Agreement

90.     Until August 2017, XXIII had been willing to forbear in a good faith attempt to

cooperate with Defendants to find a commercial resolution to the situation.  Since late 2016, Decade consistently represented to XXIII that Decade was attempting to find another lender which would loan enough money to Decade to pay off XXIII.  In the summer of 2017, Decade represented to XXIII that Decade had identified and was engaged in negotiations with a potential new lender.  XXIII waited for those negotiations to proceed and even undertook efforts to support a potential transaction with a potential new lender.  In July 2017, however, Decade informed XXIII that the potential new lender purportedly began to back away from certain terms of the loan it was willing to extend.  As a result, it became apparent to XXIII that those negotiations would not bear fruit, and that a reasonable commercial resolution was unlikely. Decade allegedly continued to search for new financing in August 2017.  It was unsuccessful.

91.    On or about July 25, 2017, after it became apparent that Decade would be unable to pay off XXIII's loan and negotiations with the new lender fell through, representatives of XXIII and of Decade met in New York to discuss the situation.  Among other things, at that meeting, XXIII pressed Decade for additional information regarding the Payments that had not been paid into the Lockbox or to XXIII.  For the first time, Decade represented that there were *additional* contributing factors beyond simply Aaron Goodwin's intentional diversion of Payments.  According to the Decade representatives during that meeting:

a.    $2.1 million of Payments that XXIII believed were owed to GAME would never be paid, because they represented commissions on contracts which had already been terminated prior to the Transactions.

b.    $1.575 million of Payments were owed under an endorsement contract between a professional basketball player and Adidas, but the player had breached that agreement and as a result was not receiving compensation (from which the Payments would be made)

pursuant to that contract. That breach had occurred before the Transactions closed, but XXIII had never been informed of it.

      c.    $400,000 of Payments were owed from another professional basketball player, who failed to make his required commission payments.

      d.    In addition to these sources of deficiencies, Decade finally informed XXIII about the full scope of Aaron Goodwin's diversion of funds: Decade reported that, based on Decade's own calculations and correspondence *from Goodwin himself*, as of that date Goodwin had personally collected approximately $4.1 million in Payments on behalf of GAME and GSM and had forwarded to Decade only 32.5% of those funds, or approximately $1,332,500, representing a shortfall of approximately $2,767,500.

92.    Each of these admissions standing alone constitutes yet another breach of Decade's obligations to make Payments to the Lockbox for the purpose of reimbursing XXIII. These facts also breach Decade's representations and warranties under the Loan Agreement. They all constitute additional Events of Default.

93.    *Even by Decade's own admission*, the total sum of Payments that should have been, but have not been, deposited into the Lockbox to date exceeds $7.3 million, exclusive of interest.

      E.    **XXIII Gains Access to Decade's Books and Records and Discovers Other Improprieties**

94.    In late August and September 2017, after many requests by XXIII, Decade finally made its financial records available to XXIII, as it was required to do under section 2.10 of the Loan Agreement. Upon review, XXIII discovered further breaches of the Loan Agreement and additional reasons to believe that Defendants have been concealing and diverting funds that should have been remitted into the Lockbox.

95.     A review of Decade's bank statements and general ledgers revealed that Defendants had been utilizing their operating accounts – which were supposed to receive Payments (if at all) *only after* such funds were released from the Lockbox – to receive Payments from Aaron Goodwin and then to make payments from Decade, S.A.C. to other Decade entities for the purpose of paying the Goodwins, other employees, and Aden and James (either directly or through other, non-Decade corporate entities that they own or control).  Decade had been improperly and clandestinely using these accounts <u>since at least June 2016</u> to receive Payments outside of the Lockbox**.**

96.     XXIII also discovered a number of disbursements, totaling at least hundreds of thousands of dollars, going to either unnamed or unfamiliar entities, for no discernable business purpose.

97.     XXIII further discovered that Decade had obtained loans from other lenders after the Transactions, and has repaid them in full or in part, while leaving unsatisfied its obligations to XXIII.  Decade's additional borrowings violated sections 6.8(c) and 7.3(a) of the Loan Agreement, which prohibit any Loan Party from taking on debt without the consent of XXIII except under certain specified situations not applicable here.

98.     Finally, perhaps in anticipation of this litigation, Decade summarily zeroed out all of its entities' accounts in or about May 2017, meaning that there are currently no funds in the Lockbox or even in the unauthorized deposit accounts.

**F.      Defendants Are Currently in Default of Their Agreements, Are Insolvent and/or Are Secreting Assets, and Have Harmed XXIII**

**i.      The Borrowers Are in Default Under the Terms of the Loan Agreement**

99.     Decade has committed and caused numerous Events of Default under the Loan Agreement, as described above.  These Events of Default are continuing.

100.    Pursuant to XXIII's acceleration of the loan as a result of the Events of Default, the entire Indebtedness became immediately due and payable no later than March 24, 2017. There has been no repayment, and not less than $22 million is currently past due and payable.

101.    Decade has breached the Loan Agreement in numerous ways, as detailed herein.

### ii.    The Corporate and Personal Guarantors Are in Default of Their Obligations to Repay XXIII

102.    The Guarantors have failed to pay the current Indebtedness in full.  Accordingly, the Guarantors have breached their guarantee obligations with respect to the amounts due and owing to XXIII from the Borrowers. Ex. A at §§14.1, *et seq.*

### iii.    Decade is Insolvent and/or Concealing Assets So As to Frustrate Any Adverse Judgment

103.    By multiple measures, it appears that Decade is insolvent.  Decade is clearly unable to pay its debts as they come due, as illustrated by its consistent failure to make the minimum deposits into the Lockbox and its failure to make an interest payment due under the Loan Agreement.  Moreover, Decade's liabilities are greater than its assets.

104.    Decade is insolvent because its executives have rendered it so, by improperly retaining Payments and by moving company assets out of the company accounts.  There was no justification for summarily zeroing all Decade accounts at the same time, other than the obvious: Decade wants to avoid judgment and escape its obligation to repay XXIII any amount of money.

### iv.    XXIII Is Damaged Beyond the Amounts Acknowledged by Decade

105.    Although Decade has acknowledged that it owes XXIII over $7.3 million to date, Decade in fact owes XXIII the full amount of the Indebtedness, in excess of $22 million. Interest continues to accrue on this amount at the Default Rate  as set forth in Section 2.4(e) of the Loan Agreement.  Additional costs and fees have accrued and will continue to accrue and become part of the Indebtedness.

**FIRST CAUSE OF ACTION**
**(Recovery of Chattel/Replevin against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Gotham and Decade Executives)**

106.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

107.    Decade has defaulted under the terms of the Loan Agreement.

108.    Gotham and Decade Executives have defaulted on their guarantee obligations.

109.    XXIII enjoys perfected security interests in and liens on the Collateral of Decade, as well as the proceeds derived therefrom.

110.    Pursuant to U.C.C. Section 9-609, XXIII is entitled to the immediate possession of all Collateral in Decade's ownership, possession or custody, or subject to Decade's control or direction, or in which Decade otherwise has any rights.

111.    Pursuant to CPLR Article 71 and other applicable law, XXIII is entitled to the immediate seizure of all Collateral in Decade's ownership, possession or custody, or subject to Decade's control or direction, or in which Decade otherwise has any rights.

112.    The Collateral is likely to be the only source for obtaining payment towards amounts owed to XXIII.

113.    XXIII has no adequate remedy at law and will suffer irreparable harm unless these chattels are seized because Defendants possess *all* of the Collateral, and given Decade's refusal to honor the Lockbox, coupled with Decade's failure to pay its ongoing expenses, there is a high likelihood that Defendants will deplete, waste or otherwise hide the Collateral, which includes the Payments.  In light of Defendants' continuous, intentional, and improper diversion of the Collateral to date, and Aaron Goodwin's admission that he intends to continue his diversion of Payments and other improper conduct, Defendants are extremely likely to continue diverting Payments and directing Athletes to defy XXIII's direction letters in order to thwart

XXIII's ability to take possession of the Collateral and receive Payments.

114.     In addition, XXIII has no knowledge of whether other creditors and obligees of Decade may seek to enforce against part or all of the Collateral and the proceeds derived therefrom, which could render impossible, prohibitively expensive, and in any case more difficult the enforcement of XXIII's rights in and to the Collateral and the proceeds derived therefrom.

115.     By virtue of its first priority security interests in and liens on the Collateral, XXIII is entitled to the immediate seizure and possession of the Collateral and proceeds derived therefrom, and the application of such Collateral towards satisfaction of the Indebtedness due and owing to XXIII by Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Gotham and Decade Executives.

116.     XXIII is entitled to immediate possession of the Payments, or damages of the amount of the Indebtedness, plus interest and any additional costs and expenses, in the event that possession of the Payments is not given to XXIII.

117.     In addition, the Collateral also includes Decade's books and records, which is critical to XXIII's ability to locate funds that Decade and its executives have diverted.

118.     XXIII is entitled to immediate possession of Decade's books and records.

<u>**SECOND CAUSE OF ACTION**</u>
**(Recovery of Chattel/Replevin against Defendants Aaron Goodwin and Eric Goodwin)**

119.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.     The Payments that were made to the Goodwins rightfully belong to XXIII.

121.     XXIII is entitled to the Payments by virtue of the Transactions, to which the Goodwins were parties, which grant to XXIII a first priority security interest in and lien on virtually all of Decade's assets, which include the Payments.

122.   The Goodwins wrongfully retained and are continuing to retain Payments they have received and will receive from Athletes, despite XXIII's priority interest therein.

123.   The Collateral and the proceeds derived therefrom, including those in the Goodwins' possession, are likely to be the only source for obtaining payment towards amounts owed to XXIII.

124.   XXIII has no adequate remedy at law and will suffer irreparable harm unless these chattels are seized because Defendants possess *all* of the Collateral, and given the Goodwins' refusal to honor the Lockbox and Defendants' self-dealing, there is a high likelihood that Defendants will deplete, waste or otherwise hide the Collateral, which includes the Payments.  In light of Defendants' continuous diversion of the Collateral to date, and Aaron Goodwin's admission that he intends to continue his improper conduct, Defendants are extremely likely to continue diverting Payments and directing Athletes to defy XXIII's direction letters in order to thwart XXIII's ability to take possession of the Collateral.

125.   In addition, XXIII has no knowledge of whether other creditors and obligees of the Goodwins may seek to enforce against part or all of the Collateral and the proceeds derived therefrom, which could render impossible, prohibitively expensive, and in any case more difficult the enforcement of XXIII's rights in and to the Collateral and the proceeds derived therefrom.

126.   By virtue of its first priority security interests in and liens on the Collateral, XXIII is entitled to the immediate seizure and possession of the Collateral and proceeds derived therefrom, and the application of the Collateral towards satisfaction of the amounts improperly withheld from XXIII by the Goodwins.

127.   XXIII is entitled to immediate possession of the Payments, or damages of the amount of the Indebtedness, plus interest and any additional costs and expenses, in the event that

possession of the Payments is not given to XXIII.

## THIRD CAUSE OF ACTION
**(Breach of Contract against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM)**

128.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129.    The Loan Agreement is a binding and valid contract between the parties.

130.    Under the Loan Agreement, Plaintiff advanced not less than $16 million to Decade and made an additional $4 million available to Decade.  Plaintiff has performed its obligations under the Loan Agreement.

131.    Decade has breached various terms of the Loan Agreement, including but not limited to:

a.      Section 2.4(a), by failing to make a required interest payment under the Loan Agreement;

b.      Section 6.7(a), by failing to deposit Payments received from the Athletes into the Lockbox, by instructing the Athletes not to make Payments directly to the Lockbox, and by otherwise failing to ensure that the Athletes make Payments directly to the Lockbox;

c.      Sections 6.8(c) and 7.3(a), by incurring debt without the consent of XXIII;

d.      Section 7.13(a), by failing to deposit the required minimum amounts into the Lockbox required under the Loan Agreement; and

e.      Section 7.14, by maintaining bank deposit accounts not subject to Control Agreements (as defined in the Loan Agreement), where Defendants have received Payments and concealed them from XXIII, and where Defendants continue to do so.

f.      Section 10.2(a), by failing to pay the current Indebtedness in full.

132.    These breaches of the Loan Agreement have constituted and continue to

constitute continuing Events of Default thereunder.  Furthermore, Plaintiff properly accelerated the entire principal balance as permitted by the Loan Agreement under an Event of Default.

133.    As a direct and proximate result of Decade's breaches of the Loan Agreement, Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM are liable to XXIII, jointly and severally, as XXIII has been materially and substantially damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

134.    XXIII is also entitled to an order of specific performance of those provisions of the Loan Agreement that will allow recovery of XXIII's loan, including the Lockbox provisions, the power of attorney provision, and the books and records provisions.

### FOURTH CAUSE OF ACTION
**(Breach of Guaranty against Defendants Decade Executives, Gotham, Aden, and James)**

135.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

136.    The Loan Agreement is a binding and valid contract between the Parties.

137.    Under the Loan Agreement, Defendants Decade Executives, Gotham, Aden, and James guaranteed to XXIII the payment of all funds due and owing to XXIII pursuant to the Loan Agreement to the extent those funds are not paid by Decade.

138.    Decade has materially breached the Loan Agreement by failing to to deposit into the Lockbox the minimum amounts due under the Loan Agreement.

139.    Decade Executives, Gotham, Aden, and James have breached their guaranty obligations under the Loan Agreement by failing to pay the requisite sums to XXIII.

140.    As a direct and proximate result of these breaches of guaranty, Defendants Decade Executives, Gotham, Aden, and James are liable to XXIII, jointly and severally, as XXIII has been materially and substantially damaged in an amount to be determined at trial, but

in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

### FIFTH CAUSE OF ACTION
**(Fraud in the Inducement against All Defendants)**

141.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.    Prior to entering into the Loan Agreement, Defendants made a number of representations to XXIII regarding the contracts between the agencies purchased by Decade, including GAME and GSM, and the Athletes, which the Loan Agreement defines as the "Covered Agreements."    As reflected in Annex A-1 of the Loan Agreement, Defendants described these agreements and projected revenue streams in detail.

143.    Defendants' representations regarding the Covered Agreements were material to XXIII, as these agreements and the proceeds from them – that is, the Payments – formed a large portion of the Collateral and were the basis for XXIII's decision to lend $20 million to Defendants.

144.    Defendants knew at the time they made the representations to XXIII that certain of those representations, particularly regarding the existence and status of some of the Covered Agreements, were materially false and misleading.  Among other things, Defendants knew that:

a.    Certain of the purported Covered Agreements that Defendants represented would result in $2.1 million of Payments to GAME were already terminated prior to the Transactions and would yield no Payments;

b.    One basketball player had breached an endorsement contract with Adidas prior to the Transactions, making it highly unlikely that GSM would collect the $1.575 million of Payments that was owed under that contract.  Despite the fact that this breach had occurred

before the Transactions closed and Defendants were aware of it, they represented to XXIII that the player's Payment stream was unimpaired and would be collectable in full.

        c.      Another basketball player had failed to make $400,000 of required Payments.  Again, while  Defendants were aware of this deficiency prior to entering into the Transactions, they represented to XXIII that the player's Payment stream was unimpaired and would be collectable in full.

145.    XXIII reasonably relied on Defendants' representations regarding these agreements in calculating the value of Decade's Collateral and in determining to lend $20 million to Decade.

146.    As a direct and proximate result of Defendants' material false representations, as a result of which XXIII entered into the Loan Agreement and loaned money, XXIII has been damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

147.    In addition, based upon Defendants' egregious conduct as set forth herein, XXIII is also entitled to an award of punitive damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM)

148.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    The Loan Agreement provided that if any Payments are made to Decade rather than directly to the Lockbox, Decade must hold such Payments in trust for XXIII, and subject to XXIII's security interest and lien, until such Payments are deposited into the Lockbox.

150.    Accordingly, each and every time that Decade, including the Goodwins as its executives, received any Payments, Decade became a trustee and a fiduciary on behalf of XXIII.

151.    Decade breached its fiduciary duties by failing to handle XXIII's assets with the care and diligence required of a fiduciary, including by failing to ensure that the assets are available to XXIII.

152.    Decade further breached its fiduciary duties by failing to perform its fiduciary obligations loyally on behalf of its principal, XXIII, including by failing to place XXIII's interests in the Payments above its own and those of its executives.

153.    Among other things, Decade failed to deposit the Payments for which it was XXIII's trustee into the Lockbox or into another account accessible by XXIII.

154.    As a direct and proximate result of Decade's consistent breaches of its fiduciary duties, XXIII has been damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

155.    In addition, based upon Defendants' egregious conduct as set forth herein, XXIII is also entitled to an award of punitive damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Money Had and Received against All Defendants)

156.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

157.    By failing to direct the Payments or otherwise transfer them to the Lockbox, and actively directing Athletes to defy XXIII's directions to utilize the Lockbox, Defendants took and retained for their own use monies rightfully belonging to XXIII.

158.    Defendants personally benefited from these monies that did not belong to them, which were wrongfully retained and used for other purposes, including payments to Decade's executives.

159.    As a result, Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Decade Executives, Gotham, Aden, James, Aaron Goodwin, and Eric

Goodwin are liable to XXIII, jointly and severally, as XXIII has been materially and substantially damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

**EIGHTH CAUSE OF ACTION**
**(Accounting against All Defendants)**

160.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.    Decade has collected and received substantial funds from the Payments that have not been placed into the Lockbox.  Upon information and belief, these funds remain largely in Decade's possession, custody, or control, or have been used by Decade for improper purposes. Decade has also admitted that some of the Payments are in the possession, custody or control of its executives, including funds withheld by Aaron Goodwin and funds which were used to pay the compensation of Decade's executives.  There is a high risk that Defendants are secreting these funds from the jurisdiction.

162.    All of the information pertaining to these funds is in Decade's possession, custody or control.

163.    By reason of the foregoing, an accounting of all Defendants is required to determine, *inter alia*, the extent of Defendants' breach of their obligation to deposit said funds into the Lockbox, the true amount of the diverted funds and the value of Plaintiff's claim for damages.

**NINTH CAUSE OF ACTION**
**(Constructive Trust against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Decade Executives, and Gotham)**

164.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

165.    Pursuant to the Loan Agreement, Decade promised to keep, in trust for XXIII, all Payments that it received until such Payments were deposited into the Lockbox.  Based upon this promise, whenever Decade received Payments, Decade became a fiduciary for XXIII with regard to such Payments.

166.    XXIII relied on Decade's promises to direct Payments to the Lockbox, and it was in reliance on this promise that XXIII agreed to extend financing.

167.    Defendants have wrongfully diverted funds which rightfully belong to XXIII as secured creditor.

168.    By diverting Payments from the Lockbox and into their own accounts for their own use, Defendants have been unjustly enriched at the expense of XXIII.

169.    As a result of Decade's wrongful conduct, a constructive trust should be imposed upon the bank accounts and assets in the possession, custody, and control of Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Decade Executives, and Gotham in favor of Plaintiff, and all wrongfully received assets, including the Payments, should be disgorged and returned to Plaintiff.

## TENTH CAUSE OF ACTION
**(Tortious Interference with Contract against Defendants Aaron Goodwin and Eric Goodwin)**

170.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

171.    XXIII and Decade formed a contractual relationship upon the execution of the Loan Agreement.

172.    The Goodwins had knowledge of the Loan Agreement and accepted the benefits of the Loan Agreement, as Decade's execution of and compliance with the Loan Agreement was a condition precedent to the Goodwins' sale of GAME and GSM to Decade, as well as their

subsequent employment by Decade.

173.    Despite their awareness of Decade's contractual obligations to XXIII under the Loan Agreement, including the obligation to forward all Payments to the Lockbox, the Goodwins knowingly, intentionally and unjustifiably retained the Payments from Athletes for themselves and instructed the Athletes to disobey XXIII's direction letters.

174.    As a direct and proximate result of the Goodwins' intentional and unjustified refusal to forward the Payments to the Lockbox, Decade breached its obligations to XXIII under the Loan Agreement.

175.    As a result, Defendants the Goodwins are liable to XXIII, jointly and severally, as XXIII has been materially and substantially damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

176.    In addition, based upon Defendants' egregious conduct as set forth herein, XXIII is also entitled to an award of punitive damages in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### (Conversion against Defendants Aden, James, Aaron Goodwin, and Eric Goodwin)

177.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.    The Payments that were made to and retained by the Goodwins rightfully belonged to XXIII.  Likewise, the portions of the Payments received and retained by Aden and James rightfully belonged to XXIII.

179.    XXIII was entitled to the Payments.

180.    Unbeknownst to XXIII, the Goodwins not only retained Payments they received, but also directed the Athletes to defy XXIII's notices directing the Athletes to make Payments into the Lockbox.  Likewise, unbeknownst to XXIII, Aden and James personally benefitted from

36

the diverted Payments in the form of payments to themselves or their corporate entities.

181.    XXIII in no way authorized the Goodwins, Aden, or James, to retain these funds for their own use and benefit.

182.    By failing to direct or otherwise transfer to Plaintiff the Payments of the Athletes, including by retaining Payments from Athletes without depositing them in the Lockbox, Aden, James, and the Goodwins took and retained for their own use monies rightfully belonging to XXIII.

183.    Despite due demand by XXIII, Aden, James, and the Goodwins have not delivered to XXIII the funds that XXIII is rightfully owed.

184.    As a result of the wrongful and unlawful conversion by Aden, James, and the Goodwins of property belonging to XXIII, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

185.    In addition, based upon Defendants' egregious conduct as set forth herein, XXIII is also entitled to an award of punitive damages in an amount to be proven at trial.

### TWELFTH CAUSE OF ACTION
**(Unjust Enrichment against Defendants Aaron Goodwin and Eric Goodwin)**

186.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

187.    The Goodwins were enriched by their improper and unauthorized retention of a substantial portion of the Payments.

188.    The Goodwins were unjustly enriched at XXIII's expense at least to the extent of those portions of the Payments which they retained rather than depositing into the Lockbox.

189.    In equity and good conscience, it would be unjust to allow the Goodwins to retain those portions of the Payments which they retained.

190.    As a result, Defendants Aaron Goodwin and Eric Goodwin are liable to XXIII in an amount to be determined at trial, but in no event less than $22 million.

191.    In addition, based upon Defendants' egregious conduct as set forth herein, XXIII is also entitled to an award of punitive damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION
### (Breach of Contract against Defendants GAME, GSM, Aaron Goodwin, and Eric Goodwin)

192.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193.    Through the Share Purchase Agreement, the Goodwins sold to Decade their interests in GAME and GSM.  The Share Purchase Agreement for GAME and GSM is a binding and valid contract among GAME, GSM, Decade, S.A.C., Decade Contracts, and Aaron and Eric Goodwin.

194.    XXIII is a named and intended third-party beneficiary thereunder.

195.    Under the Share Purchase Agreement, GAME, GSM, and the Goodwins promised to make payments to the Lockbox, and further, to remit any Payments that they received outside of the Lockbox to XXIII.

196.    GAME, GSM, and the Goodwins have materially breached the Share Purchase Agreement by failing to make Payments to the Lockbox, or immediately forward payments to the Lockbox.

197.    As a direct and proximate result of these breaches, XXIII has been materially and substantially damaged in an amount to be determined at trial, but in no event less than the amount of the Indebtedness, plus interest and any additional costs and expenses.

## FOURTEENTH CAUSE OF ACTION
### (Preliminary and Permanent Injunctive Relief against All Defendants)

198.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

199.    As set forth above, Defendants have materially breached their obligations under the Loan Agreement and the Share Purchase Agreement, have defrauded XXIII, have violated their fiduciary duties to XXIII, have converted XXIII's funds, and have improperly received and retained funds belonging to XXIII, among other things.

200.    Defendants have represented that they intend to continue diverting Payments and do not intend to honor the Lockbox.  Defendants have also admitted that they have used the Payments for other purposes.

201.    Unless immediate, temporary, and permanent injunctive relief is granted, XXIII will be irreparably harmed.  XXIII lacks an adequate remedy at law for the reasons set forth above.

202.    As a result, XXIII is entitled to an injunction temporarily, preliminarily, and permanently restraining and enjoining Defendants from retaining any future Payments, directly or indirectly transferring them, or utilizing them in any way other than depositing them into the Lockbox or to XXIII, as Defendants are contractually obligated to do; directing that Defendants promptly direct any such Payments that they have received or may receive to the Lockbox or to XXIII; and prohibiting Defendants from interfering with any efforts XXIII may take to enforce such an injunction consistent with its contractual rights or any order or judgment of this Court.

**WHEREFORE**, Plaintiffs hereby demand judgment against Defendants as follows:

        a.  On the First Cause of Action for Recovery of Chattel / Replevin against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III,

GAME, GSM, Gotham and Decade Executives, an order awarding to XXIII immediate seizure and possession of the Collateral and proceeds derived therefrom, or damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post- judgment interest, attorneys' fees, and costs, in the event that possession of the Payments is not given to XXIII;

b.   On the Second Cause of Action for Recovery of Chattel / Replevin against Defendants Aaron Goodwin and Eric Goodwin, an order awarding to XXIII immediate seizure and possession of the Collateral and proceeds derived therefrom, or damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, and costs, in the event that possession of the Payments is not given to XXIII;

c.   On the Third Cause of Action for Breach of Contract against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, and such other and further relief as this Court deems just and proper, as well as specific performance of the Loan Agreement;

d.   On the Fourth Cause of Action, for Breach of Guaranty against Defendants Decade Executives, Gotham, Aden, and James, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, and such other and further relief as this Court deems just and proper;

e.   On the Fifth Cause of Action, for Fraud in the Inducement against all Defendants, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, punitive damages, and such other and further relief as this Court deems just and proper;

f.   On the Sixth Cause of Action, for Breach of Fiduciary Duty against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, punitive damages, and such other and further relief as this Court deems just and proper;

g.   On the Seventh Cause of Action, for Money Had and Received against all Defendants, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, and such other and further relief as this Court deems just and proper;

h.   On the Eighth Cause of Action, for Accounting against all Defendants, an order entitling Plaintiff to a full accounting of the books and records of Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM;

i.  On the Ninth Cause of Action, for Constructive Trust against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Decade Executives, and Gotham, the imposition of a constructive trust in Plaintiff's favor as against the assets of Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Decade Executives, and Gotham, and any revenue derived or that may be derived as a result of any disposition of such assets;

j.  On the Tenth Cause of Action for Tortious Interference with Contract against Defendants Aaron Goodwin and Eric Goodwin, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, punitive damages, and such other and further relief as this Court deems just and proper;

k.  On the Eleventh Cause of Action for Conversion against Defendants Aaron Goodwin and Eric Goodwin, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, punitive damages, and such other and further relief as this Court deems just and proper;

l.  On the Twelfth Cause of Action for Unjust Enrichment against Defendants Aaron Goodwin and Eric Goodwin, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, punitive damages, and such other and further relief as this Court deems just and proper;

m.  On the Thirteenth Cause of Action for Breach of Contract against Defendants GAME, GSM, Aaron Goodwin, and Eric Goodwin, damages in an amount to be determined at trial but believed to be not less than the Indebtedness, plus pre- and post-judgment interest, attorneys' fees, costs, and such other and further relief as this Court deems just and proper;

n.  On the Fourteenth Cause of Action, for Preliminary and Permanent Injunctive Relief against all Defendants, an order temporarily, preliminarily, and permanently restraining and enjoining Defendants from retaining any future Payments, directly or indirectly transferring them, or utilizing them in any way other than depositing them into the Lockbox as Defendants are contractually obligated to do.

Dated: New York, New York
        September 12, 2017

                                        LOEB & LOEB LLP

                                        By:    _____
                                               Evan Farber
                                               William M. Hawkins
                                               Erin Smith Dennis
                                               345 Park Avenue
                                               New York, NY 10154
                                               Tel. 212.407.4000

                                               *Attorneys for Plaintiff*