UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

XXIII CAPITAL LIMITED,

              Plaintiff,

     v.

DECADE, S.A.C., LLC, DECADE, S.A.C.
CONTRACTS, LLC, DECADE, S.A.C. I, LLC,
DECADE, S.A.C. II, LLC, DECADE, S.A.C.
III, LLC, GOODWIN ASSOCIATES
MANAGEMENT ENTERPRISES, INC.,
GOODWIN SPORTS MANAGEMENT, INC.,
DECADE, S.A.C. EXECUTIVES, LLC,
GOTHAM S&E HOLDINGS, LLC,
CHRISTOPHER ADEN, DORSEY JAMES,
AARON GOODWIN, and ERIC GOODWIN,

              Defendants.

No. 17 Civ. 6910

**DEFENDANTS AARON AND ERIC
GOODWIN'S ANSWER TO AMENDED
COMPLAINT, COUNTERCLAIMS, AND
CROSSCLAIMS**

Defendants Aaron Goodwin and Eric Goodwin (together with Aaron Goodwin, the "Goodwins") answer Plaintiff XXIII Capital Limited's ("Plaintiff") Complaint as follows:

## NATURE OF THE ACTION

1.     To the extent Paragraph 1 consists of Plaintiff's characterization of its Claims, no response is required.  To the extent a response is required, the Goodwins deny the allegations in Paragraph 1.

2.     The Goodwins deny that they currently owe Plaintiff any amount of monies.  The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 2.

3.     The Goodwins admit that Goodwin Associates Management Enterprises, Inc. ("GAME") and Goodwin Sports Management, Inc." ("GSM") are sports agencies and that the Goodwins wholly owned these agencies.  The Goodwins further admit that they intended to sell

their shares in Game and GSM to Decade, S.A.C., LLC ("Decade, S.A.C."), Decade, S.A.C. Contracts, LLC ("Decade Contracts"), Decade, S.A.C. I, LLC ("Decade I"), Decade, S.A.C. II, LLC ("Decade II"), Decade, S.A.C. III, LLC ("Decade III"), Decade, S.A.C. Executives, LLC ("Decade Executives") (collectively, "Decade") and that the Goodwins received partial compensation for the sale. The Goodwins assert that the agreements upon which Plaintif relies and alleges were signed by the Goodwins were not, in fact, the agreements to which the Goodwins agreed (hereinafter defined as the "Intended Agreements"). The Goodwins admit that the Intended Agreements would have made them employees of Decade, but deny that they are currently receiving any compensation from Decade. The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 3.

4.    The Goodwins deny the allegations in the first sentence in Paragraph 4. The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 4.

5.    The Goodwins admit that the professional athletes (the "Athletes") have continued to make Payments to the Goodwins. The Goodwins further admit that they have retained a portion of those Payments, but deny that they have forwarded less than a third of the Payments to Decade. The Goodwins further admit that they have not transferred Payments into the Lockbox, but deny that they violated any obligations under the Intended Agreements. The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations against Decade, Aden, and James in Paragraph 5.

6.    The Goodwins deny that they have intentionally subverted the Lockbox. The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 6.

7.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 7.

8.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 8.

9.     The Goodwins deny receiving "substantial payments."  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 9.

10.     The Goodwins admit that they have not made payments to the Lockbox.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 10.

## THE PARTIES

11.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 11.

12.     The Goodwins admit that they are citizens of and reside in the United States.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations contained in Paragraph 12.

13.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 13.

14.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 14.

15.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 15.

16.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 16.

17.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 17.

18.     The Goodwins deny that the transactions contemplated by the Intended Agreements were fully consummated causing GAME to be a wholly-owned subsidiary of Defendant Decade Contracts.  The Goodwins admit the remaining allegations in Paragraph 18.

19.     The Goodwins deny that the transactions contemplated by the Intended Agreements were fully consummated causing GSM to be a wholly-owned subsidiary of Defendant Decade Contracts.  The Goodwins admit the remaining allegations in Paragraph 19.

20.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 20.

21.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 21.

22.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 22.

23.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 23.

24.     The Goodwins deny that the transactions contemplated by the Intended Agreements were fully consummated causing Aaron Goodwin to be an employee of Decade Executives.   The Goodwins further deny that Aaron Goodwin is a citizen and resident of Washington State.  Aaron Goodwin is a citizen and resident of the state of California.

25.     The Goodwins deny that the transactions contemplated by the Intended Agreements were fully consummated causing Eric Goodwin to be an employee of Decade

Executives.   The Goodwins further deny that Eric Goodwin is a citizen and resident of California.  Eric Goodwin is a citizen and resident of the state of Washington.

## JURISDICTION AND VENUE

26.    Paragraph 26 states a legal conclusion that requires no answer.

27.    Paragraph 27 states legal conclusions that require no answer.  To the extent a response is required, the Goodwins deny the remaining allegations in Paragraph 27.

## FACTUAL ALLEGATIONS

28.    The Goodwins admit that they provided signature blocks for certain documents that purported to be related to these Transactions.  The Goodwins intended that their signature blocks be attached to the Intended Agreements, and not the documents that XXIII alleges are related to these Transactions (hereinafter the "Alleged Agreements").   The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 28.

29.    The Goodwins state that the Alleged Agreements are not the Intended Agreements.  The Goodwins admit that Exhibit A purports to be a copy of the Loan, Guaranty and Security Agreement, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins further admit that Exhibit B purports to be a copy of the Share Purchase Agreement, but deny that the Share Purchase Agreement in the form attached by Plaintiff is part of the Intended Agreements.  The Goodwins also admit that Exhibits C and D purport to be copies of Executive Employment Agreements.   These documents speak for themselves and no further response is required.

30.     The Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 30 that vary or differ from the referenced document.

31.     To the extent Paragraph 31 purports to characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 31 that vary or differ from the referenced document. The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 31.

32.     To the extent Paragraph 32 purports to characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 32 that vary or differ from the referenced document.

33.     To the extent Paragraph 33 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 33 that vary or differ from the referenced document.

34.     To the extent that Paragraph 34 consists of conclusions of law, no response is required.  To the extent Paragraph 34 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 34.

35.     To the extent Paragraph 35 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 35 that vary or differ from the referenced document.

36.     To the extent Paragraph 36 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins further deny that the revenues generated by GAME and GSM are part of the Collateral.  The Goodwins deny any allegations in Paragraph 36 that vary or differ from the referenced document.

37.     To the extent Paragraph 37 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the

transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 37 that vary or differ from the referenced document.

38.      To the extent Paragraph 38 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 38 that vary or differ from the referenced document.

39.      To the extent Paragraph 39 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 39 that vary or differ from the referenced document.

40.      To the extent Paragraph 40 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 40 that vary or differ from the referenced document.

41.      To the extent Paragraph 41 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself,

but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 41 that vary or differ from the referenced document.

42. To the extent Paragraph 42 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 42 that vary or differ from the referenced document.

43. To the extent Paragraph 43 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 43 that vary or differ from the referenced document.the

44. To the extent Paragraph 44 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 44 that vary or differ from the referenced document.

45.     To the extent Paragraph 45 purports to quote or characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 45 that vary or differ from the referenced document.

46.     To the extent Paragraph 46 purports to quote or characterize the Loan Agreement and the other relevant Transaction documents, the Goodwins state that these documents in the forms attached by Plaintiff speak for themselves, but deny that the Loan Agreement and the other relevant Transaction documents were properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated. The Goodwins deny any allegations in Paragraph 46 that vary or differ from the referenced documents.

47.     The Goodwins admit that they provided signature blocks to Aden, but deny that they entered into the Share Purchase Agreement with Decade Contracts and Decade, S.A.C. that is part of the Alleged Agreements.  The Goodwins deny any remaining allegations in Paragraph 47 that vary or differ from the referenced document.

48.     To the extent Paragraph 48 purports to characterize the Share Purchase Agreement, the Goodwins state that the Share Purchase Agreement speaks for itself, but deny that the alleged Share Purchase Agreement is valid to the extent it differs from the Intended Agreements.

49.     To the extent Paragraph 49 purports to characterize the Share Purchase Agreement, the Goodwins state the Share Purchase Agreement speaks for itself, but deny that the alleged Share Purchase Agreement valid to the extent it differs from the Intended Agreements.

The Goodwins deny any allegations in Paragraph 49 that vary or differ from the referenced document.  Further, to the extent that a valid Share Purchase Agreement exists, the Goodwins deny that they are not entitled to "contingent consideration."

50.     To the extent Paragraph 50 purports to characterize the Share Purchase Agreement, the Goodwins state that the Share Purchase Agreement speaks for itself, but deny that the alleged Share Purchase Agreement is valid to the extent it differs from the Intended Agreements.

51.     To the extent Paragraph 51 purports to characterize the Executive Employment Agreements, the Goodwins state that these documents in the forms attached by Plaintiff speaks for themselves, but deny that the Goodwins are parties to these documents. The Goodwins are parties only to the Intended Agreements and not the Alleged Agreements.  The Goodwins admit that they were intended to be employees of Decade under the Intended Agreements.

52.     To the extent Paragraph 51 purports to characterize or quote the Executive Employment Agreements, the Goodwins state that these documents in the forms attached by Plaintiff speaks for themselves, but deny that the Goodwins are parties to these documents. The Goodwins are parties only to the Intended Agreements and not the Alleged Agreements.  The Goodwins admit that they were intended to be employees of Decade under the Intended Agreements.

53.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 53.

54.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 54.

55.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 55.

56.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 56.

57.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 57.

58.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 58.

59.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 59.

60.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 60.

61.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 61.

62.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 62.

63.     The Goodwins deny that they have breached the Loan Agreement, as they are not parties to the Loan Agreement, and for the same reason, the Goodwins also deny that they have defaulted under the Loan Agreement.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 63.

64.     The Goodwins admit that certain of the Athletes represented by them received letters regarding redirection of their payments to GAME and GSM.   The Goodwins lack

sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 64.

65.     To the extent Paragraph 65 purports to characterize or quote the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.   The Goodwins deny any allegations in Paragraph 65 that vary or differ from the referenced documents.   The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 65.

66.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 66.

67.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 67.

68.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 68.

69.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 69.

70.     The Goodwins admit that Exhibit E purports to be a letter from XXIII to Decade, dated December 7, 2016.  To the extent Paragraph 70 purports to quote or characterize the letter, the Goodwins state that the referenced document speaks for itself and no further response regarding its content is required.  The Goodwins deny any allegations in Paragraph 70 that vary or differ from the referenced document.

71.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 71.

72.     To the extent Paragraph 72 purports to characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 72 that vary or differ from the referenced document.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 72.

73.     To the extent Paragraph 73 purports to characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny any allegations in Paragraph 73 that vary or differ from the referenced document.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 73.

74.     The Goodwins admit that Exhibit F purports to be a letter from XXIII to Decade, dated March 21, 2017.  To the extent Paragraph 74 purports to quote or characterize the letter, the Goodwins state that the referenced document speaks for itself and no further response regarding its content is required.  The Goodwins deny any allegations in Paragraph 74 that vary or differ from the referenced document.

75.     To the extent Paragraph 75 purports to characterize a March 21, 2017 letter, the Goodwins state that the referenced document speaks for itself and no further response regarding

its content is required.  The Goodwins deny any allegations in Paragraph 75 that vary or differ from the referenced document.

76.    The Goodwins deny that they diverted Payments from the Lockbox.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 76.

77.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations 77.

78.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 78.

79.    The Goodwins deny that they were executives of Decade pursuant to the Alleged Agreements.  The Goodwins further deny that Aaron Goodwin violated any obligation to direct Payments to the Lockbox.  The Goodwins also deny that Eric Goodwin had any obligation to intervene to direct Payments to the Lockbox.  The Goodwins further deny that millions of dollars of Payments from GSM obligors went missing.  In addition, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 79.

80.    The Goodwins admit that they forwarded 37.5% of certain Payments to Decade, in accordance with the Goodwins' understanding of their agreement with Decade.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 80.

81.    The Goodwins admit that Aaron Goodwin instructed the Athletes to continue making Payments as they had always been making them, but deny that this instruction violated

any obligations under Aaron Goodwin's Executive Employment Agreement or the Intended Agreements, and the Loan Agreement. The Goodwins deny that they have any obligation to honor the Lockbox arrangement.

82. To the extent Paragraph 82 consists of conclusions or assertions of law, no response is required. To the extent Paragraph 82 purports to characterize the Share Purchase Agreement, the Goodwins deny that the Share Purchase Agreement as attached by Plaintiff was part of the Intended Agreements and that it is binding on the Goodwins. The Goodwins deny any allegations in Paragraph 82 that vary or differ from the referenced document.

83. To the extent Paragraph 83 consists of conclusions or assertions of law, no response is required. The referenced documents also speak for themselves, except that Goodwins deny that the Share Purchase Agreement as attached by the Plaintiff was part of the Intended Agreements and that it is binding on the Goodwins. The Goodwins further deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.

84. To the extent Paragraph 84 consists of conclusions or assertions of law, no response is required. The referenced documents also speak for themselves, except that the Goodwins deny that the Share Purchase Agreement as attached by the Plaintiff was part of the Intended Agreements and that it is binding on the Goodwins. The Goodwins further deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.

85. To the extent Paragraph 85 purports to characterize letters sent by Decade and by XXII, those letters speak for themselves and no response is required. The Goodwins admit that Aaron Goodwin participated in a telephone conversation with someone from XXIII in April

2017, but deny that XXIII is entitled to the Payments.  The Goodwins deny that they were executives of Decade pursuant to the Alleged Agreements.  The Goodwins further deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins deny the remaining allegations in Paragraph 85.

86.    The Goodwins deny that they have improperly retained any Payments.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 86.

87.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 87.

88.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 88.

89.    The Goodwins admit that they have received certain payments from Decade, but deny that they were paid on a "regular" basis.  The Goodwins further deny that they have received all payments to which they are entitled under either the Intended Agreements or the Alleged Agreements.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 89.

90.    The Goodwins deny that they have diverted and withheld Payments from Decade and/or XXIII.  The Goodwins further deny that they have conspired to take XXIII's money.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 90.

91.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in  Paragraph 91.

92.     The Goodwins deny that Aaron Goodwin diverted funds from Decade.   The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 92.

93.     Paragraph 93 consists of conclusions or assertions of law to which no response is required.

94.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 94.

95.     The Goodwins deny that they have concealed and diverted funds that should have been remitted into the Lockbox.  To the extent Paragraph 95 consists of conclusions or assertions of law, no response is required.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 95.

96.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 96.

97.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 97.

98.     The Goodwins admit that they loaned funds to Decade.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 98.

99.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 99.

100.    To the extent Paragraph 100 consists of conclusions or assertions of law, no response is required.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 100.

101.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 101.

102.    To the extent Paragraph 102 consists of conclusions or assertions of law, no response is required.  The Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.

103.    To the extent Paragraph 103 consists of conclusions or assertions of law, no response is required.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 103.

104.    The Goodwins admit that Decade has failed to pay debts to the Goodwins as they have come due, pursuant to both the Intended Agreements and the Alleged Agreements.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 104.

105.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 105.

106.    The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 106.

**FIRST CAUSE OF ACTION**
**(Recovery of Chattel/Replevin against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Gotham and Decade Executives)**

107.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 106 of the Complaint as is fully set forth herein.

108.    Because the allegations set forth in Paragraph 108 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 108.  The Goodwins

further deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.

109.    Because the allegations set forth in Paragraph 109 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 109.

110.    Because the allegations set forth in Paragraph 110 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade.  The Goodwins state that they lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 110.

111.    Because the allegations set forth in Paragraph 111 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade and deny the remaining allegations in Paragraph 111.

112.    Because the allegations set forth in Paragraph 112 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade and deny the remaining allegations in Paragraph 112.

113.    Because the allegations set forth in Paragraph 113 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade.  The Goodwins state that they lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 113.

114.    The Goodwins deny that they intend to divert Payments or engage in any other improper conduct.  Because the allegations set forth in Paragraph 114 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade and deny the remaining allegations in Paragraph 114.

115.    Because the allegations set forth in Paragraph 115 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade.  The Goodwins state that they lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 115.

116.    Because the allegations set forth in Paragraph 116 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade and deny the remaining allegations in Paragraph 116.

117.    Because the allegations set forth in Paragraph 117 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 117.

118.    Because the allegations set forth in Paragraph 118 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade and deny the remaining allegations in Paragraph 118.

119.    Because the allegations set forth in Paragraph 119 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 119.

**SECOND CAUSE OF ACTION**
**(Recovery of Chattel/Replevin against Defendants Aaron Goodwin and Eric Goodwin)**

120.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 119 of the Complaint as is fully set forth herein.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    The Goodwins deny that the revenues generated from GSM and GAME are part of the Collateral of Decade.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 126.

127.    Denied.

128.    Denied.

**THIRD CAUSE OF ACTION**
**(Breach of Contract against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM)**

129.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 128 of the Complaint as is fully set forth herein.

130.    Because the allegations set forth in Paragraph 130 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed

by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 130.

131.    Because the allegations set forth in Paragraph 131 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 131.

132.    Because the allegations set forth in Paragraph 132 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.  The Goodwins further deny that Athletes were required to make Payments to the Lockbox and deny the remaining allegations in Paragraph 132.

133.    Because the allegations set forth in Paragraph 133 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 133.

134.    Because the allegations set forth in Paragraph 134 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 134.

135.     Because the allegations set forth in Paragraph 135 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 135.

### FOURTH CAUSE OF ACTION
**(Breach of Guaranty against Defendants Decade Executives, Gotham, Aden, and James)**

136.     The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 135 of the Complaint as is fully set forth herein.

137.     Because the allegations set forth in Paragraph 137 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 137.

138.     Because the allegations set forth in Paragraph 138 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 138.

139.     Because the allegations set forth in Paragraph 139 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 139.

140.    Because the allegations set forth in Paragraph 140 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 140.

141.    Because the allegations set forth in Paragraph 141 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 141.

## FIFTH CAUSE OF ACTION
### (Fraud in the Inducement against All Defendants)

142.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint as is fully set forth herein.

143.    The Goodwins deny that they made any representations to XXIII regarding the contracts between GAME and GSM and the Athletes, as the Goodwins are not parties to the Loan Agreement.  To the extent Paragraph 143 purports to characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.

144.    Denied.

145.    The Goodwins admit that certain agreements with certain Athletes were terminated prior to the Transactions.  The Goodwins further admit that certain Athletes had breached contracts and/or failed to make required payments.  The Goodwins deny that they made any representations to XXIII concerning any of the agreements with the Athletes.  The Goodwins

lack sufficient information to form a belief as to the truth of the allegations in Paragraph 145 as to the other Defendants.

146.    Denied.

147.    Denied.

148.    Denied.

## SIXTH CAUSE OF ACTION
**(Breach of Fiduciary Duty against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, and GSM)**

149.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 148 of the Complaint as is fully set forth herein.

150.    Because the allegations set forth in Paragraph 150 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated and deny the remaining allegations in Paragraph 150.

151.    Because the allegations set forth in Paragraph 151 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny that they are executives of Decade pursuant to the Alleged Agreements and deny the remaining allegations in Paragraph 151.

152.    Because the allegations set forth in Paragraph 152 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 152.

153.    Because the allegations set forth in Paragraph 153 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 153.

154.     Because the allegations set forth in Paragraph 154 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 154.

155.     Because the allegations set forth in Paragraph 155 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 155.

156.     Because the allegations set forth in Paragraph 156 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 156.

## SEVENTH CAUSE OF ACTION
### (Money Had and Received against All Defendants)

157.     The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 156 of the Complaint as is fully set forth herein.

158.     Denied.

159.     Denied.

160.     Denied.

## EIGHTH CAUSE OF ACTION
### (Accounting against All Defendants)

161.     The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 160 of the Complaint as is fully set forth herein.

162.     Denied.

163.     The Goodwins lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 163.

164.     Denied.

## NINTH CAUSE OF ACTION
**(Constructive Trust against Defendants Decade, S.A.C., Decade Contracts, Decade I, Decade II, Decade III, GAME, GSM, Decade Executives, and Gotham)**

165.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 164 of the Complaint as is fully set forth herein.

166.    Because the allegations set forth in Paragraph 166 are not directed toward the Goodwins, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 166.

167.    Because the allegations set forth in Paragraph 167 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 167.

168.    Because the allegations set forth in Paragraph 168 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 168.

169.    Because the allegations set forth in Paragraph 169 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 169.

170.    Because the allegations set forth in Paragraph 170 are not directed toward the Goodwins and because they set forth legal conclusions, no response is required.  To the extent that a response is required, the Goodwins deny the allegations in Paragraph 170.

## TENTH CAUSE OF ACTION
**(Tortious Interference with Contract against Defendants Aaron Goodwin and Eric Goodwin)**

171.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 170 of the Complaint as is fully set forth herein.

172.    To the extent that the allegations in Paragraph 172 purport to characterize the Loan Agreement, the Goodwins state that the Loan Agreement in the form attached by Plaintiff speaks for itself, but deny that the Loan Agreement was properly executed by GAME and GSM, as the transactions contemplated by the Intended Agreements were never fully consummated.

173.    Denied.

174.    Denied.

175.    Denied.

176.    Denied.

177.    Denied.

## ELEVENTH CAUSE OF ACTION
**(Conversion against Defendants Aden, James, Aaron Goodwin, and Eric Goodwin)**

178.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 177 of the Complaint as is fully set forth herein.

179.    The Goodwins deny that the Payments that were made to and retained by the Goodwins rightfully belonged to XXIII.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 179.

180.    Denied.

181.    The Goodwins admit that they retained Payments, but deny that they were obligated to place Payments into the Lockbox.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 181.

182.    The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 182.

183.     The Goodwins deny that they took and retained for their own use monies rightfully belonging to XXIII.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 183 as to Aden and James.

184.     The Goodwins admit that they have not delivered funds to XXIII, but deny that XXIII is rightfully owed any such funds.  The Goodwins lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 184 as to Aden and James.

185.     Denied.

186.     Denied.

## TWELFTH CAUSE OF ACTION
### (Unjust Enrichment against Defendants Aaron Goodwin and Eric Goodwin)

187.     The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 186 of the Complaint as is fully set forth herein.

188.     Denied.

189.     Denied.

190.     Denied.

191.     Denied.

192.     Denied.

## THIRTEENTH CAUSE OF ACTION
### (Breach of Contract against Defendants GAME, GSM, Aaron Goodwin, and Eric Goodwin)

193.     The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 192 of the Complaint as is fully set forth herein.

194.     The Goodwins admit that the Share Purchase Agreement purported to effectuate the sale of the Goodwins' interests in Game and GSM to Decade, but deny that the Share

Purchase Agreement for Game and GSM is a binding and valid contract among GAME, GSM, Decade, S.A.C., Decade Contracts, and Aaron and Eric Goodwin.

195.    To the extent Paragraph 195 purports to characterize the Share Purchase Agreement, the Goodwins state that the Share Purchase Agreement speaks for itself, but deny that the alleged Share Purchase Agreement is valid to the extent it differs from the Intended Agreements.

196.    To the extent Paragraph 196 purports to characterize the Share Purchase Agreement, the Goodwins state that the Share Purchase Agreement speaks for itself, but deny that the alleged Share Purchase Agreement is valid to the extent it differs from the Intended Agreements.

197.    Denied.

198.    Denied.

## FOURTEENTH CAUSE OF ACTION
**(Preliminary and Permanent Injunctive Relief against All Defendants)**

199.    The Goodwins re-allege and incorporate by reference their responses to Paragraphs 1 through 198 of the Complaint as is fully set forth herein.

200.    Denied.

201.    Denied.

202.    Denied.

203.    Denied.

## AFFIRMATIVE DEFENSES

Having answered the allegations in the Amended Complaint, the Goodwins set forth the following affirmative defenses.  By setting forth these affirmative defenses, the Goodwins do not assume any burden of proof as to any fact issue or other element of any cause of action that

properly belongs to Plaintiff.  Further, the Goodwins reserve the right to amend or supplement their affirmative defenses as discovery or further investigation may justify.

1.     The Amended Complaint fails to state a claim against the Goodwins for which relief can be granted.

2.     Plaintiff's claims for relief are based on contracts that are void due to fraud in the execution of the agreements.

3.     Plaintiff's claims for relief are based on contracts that are void due to fraud in the inducement.

4.     Plaintiff's claims are barred in whole or in part by equitable doctrines, including but not limited to unclean hands, laches, waiver, avoidable consequences, and/or estoppel.

5.     Plaintiff failed to mitigate its damages, if any.

6.     Plaintiff's claims for relief are barred in whole or in part by the relevant statute of limitations.

7.     Plaintiff's claims for relief or requested damages are in whole or in part barred by the economic loss doctrine.

8.     Plaintiff's claims are barred in whole or in part by the doctrine of unjust enrichment.

9.     Plaintiff's damages, if any, were proximately caused, in whole or in part, by the fault of others, including the other Defendants named in this Amended Complaint.

WHEREFORE, having fully answered Plaintiff's Amended Complaint, Defendants pray for judgment as follows:

A.     That Plaintiff takes nothing by its Amended Complaint and that the Amended Complaint be dismissed with prejudice;

B.      For an award of costs of defending this action, including reasonable attorneys' fees, costs, and disbursements;

C.      For such other and further relief as this Court may deem just and proper.

## COUNTERCLAIMS

Counterclaimants Aaron Goodwin ("Aaron") and Eric Goodwin ("Eric") (together, the "Goodwins") allege the following Counterclaims against XXIII Capital Limited ("XXIII"):

1.      This claim arises out of XXIII's deliberate actions to interfere with Aaron and Eric Goodwins' contractual relationships with certain players and prospective players in the National Basketball Association ("NBA").   In April 2017, XXIII sent letters to several of the Goodwins' clients and falsely instructed them to direct payments to XXIII, rather than to the Goodwins.

2.      XXIII's actions have damaged the Goodwins' relationship with several of their clients and put them in a negative position with one of the top young players in the NBA.

## THE PARTIES

3.      Aaron Goodwin is a citizen and resident of the state of California.

4.      Eric Goodwin is a citizen and resident of the state of Washington.

5.      Upon information and belief, XXIII Capital Limited is a corporation incorporated in the United Kingdom and with a principal place of business in the United Kingdom.

## JURISDICTION

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity of citizenship between the parties and the amount in controversy

exceeds $75,000, exclusive of costs and interest and pursuant to Federal Rule of Civil Procedure 13.

## FACTUAL ALLEGATIONS

7.     The Goodwins have been successful National Basketball Association ("NBA") player agents for almost 30 years.

8.     In 1993,  Eric Goodwin formed Goodwin Sports Management, Inc. ("GSM"), a Washington corporation.  GSM is the entity through which the Goodwins manage athletes' endorsement contracts.  Aaron Goodwin formed Goodwin Associates Management Enterprises, Inc., a California corporation ("GAME"), which is the entity which negotiates the players' NBA contracts.

9.     Together the Goodwins have represented more than 60 current or former NBA players.

10.     As sports agents, the Goodwins broker employment and endorsement contracts on behalf of their clients.  The Goodwins broker these contracts pursuant to separate marketing representation agreements with their clients.

11.     Under the terms of the Goodwins' agreements with their clients, the Goodwins receive periodic commission payments when their clients receive salary and/or endorsement payments.

12.     As of February 2016, the value of the Goodwins' and their related entities' rights to commissions from their current and former players NBA and endorsement contracts was approximately $30 million.

13.     Upon information and belief, XXIII became aware of the specific agreements between the Goodwins and individual clients in February 2016.

14.     At no time did the Goodwins enter into any actual or purported contractual relationship with XXIII.

15.     At no time did the Goodwins have any obligations to either place their commission payments in a lockbox or transmit their commission payments to XXIII.

16.     On April 12, 2017, Aaron spoke to Traub via telephone.   During this conversation, Traub told Aaron that he was in possession of documents that the Goodwins had signed with XIII.

17.     Aaron informed Traub that the Goodwins had never signed any agreements with XXIII and that XXIII was relying on a fraudulent contract that the Goodwins never signed.

18.     In April of 2017, XXIII sent a letter to some of the Goodwins' clients and to a prospective client that the Goodwins were trying to recruit stating that all payments should be directed to XXIII directly, rather than to the Goodwins.  The letters were signed by Jason Traub ("Traub").

19.     These letters contained many factual inaccuracies, including but not limited to stating that any payments made to the Goodwins would not satisfy the athletes' obligations to make payments under their agreements with the Goodwins and would result in double liability for the payments.

20.     By sending the letters to the Goodwins' current clients, XXIII intentionally interfered with the Goodwins' contractual relationships with their clients.

## FIRST CAUSE OF ACTION
### (Tortious Interference with Contractual Relations)

21.     The Goodwins repeat the allegations above as if fully set forth herein.

22.     The Goodwins and their clients are parties to numerous marketing representation agreements, which are valid and binding contracts.

23.     According to the terms of the marketing representation agreements, the clients are obligated to make payments directly to the Goodwins upon receipt of salary and endorsement payments.

24.     XXIII was aware of the contracts between the Goodwins and their clients.

25.     XXIII intentionally sent letters to the Goodwins' clients which instructed the clients to breach their agreements with the Goodwins by making payments to XXIII instead of to the Goodwins.

26.     XXIII had no justification for sending these letters to the Goodwins' clients, as XXIII has no contractual or other right to the commissions that the Goodwins receive from their clients.

27.     As a direct and proximate result of  XXIII's actions, the Goodwins have been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Business Relations)

28.     The Goodwins repeat the allegations above as if fully set forth herein.

29.     The Goodwins were conducting negotiations with a prospective client who was a top young player in the NBA.

30.     XXIII was aware of the negotiations between the Goodwins and their prospective client.

31.     XXIII intentionally sent a letter to the Goodwins' prospective client which falsely informed the prospective client that XXIII had a lien on the Goodwins' commissions and that the prospective client needed to make payments directly to XXIII or face double liability for his payments.

32.     XXIII had no justification for sending these letters to the Goodwins, as XXIII has no contractual or other right to the commissions that the Goodwins receive from their clients.

33.     As a direct and proximate result of XXIII's actions, the Goodwins were put in a negative position with the prospective client.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaimants Aaron and Eric Goodwin respectfully demand judgment against XXIII as follows:

A.  Declaring that XXIII has tortuously interfered with the Goodwins' contractual relationships with their clients;

B.  Declaring that XXIII has tortuously interfered with the Goodwins' relationship with their prospective client;

C.  Awarding the Goodwins damages, as well as punitive damages, in an amount to be proven at trial; and

D.  Granting any such other relief as the Court deems appropriate and proper.

*   *   *

**CROSSCLAIMS AGAINST CROSS-DEFENDANTS
DECADE, S.A.C., LLC, DECADE, S.A.C. CONTRACTS, LLC,
DECADE, S.A.C. I, LLC, DECADE,  S.A.C. II, LLC, DECADE, S.A.C. III, LLC,
DECADE, S.A.C. EXECUTIVES, LLC, CHRISTOPHER ADEN, AND DORSEY JAMES**

Crossclaimants Aaron Goodwin ("Aaron") and Eric Goodwin ("Eric") (together, the "Goodwins") allege the following Crossclaims against Decade, S.A.C., LLC ("Decade, S.A.C."), Decade, S.A.C. Contracts, LLC ("Decade Contracts"), Decade, S.A.C. I, LLC ("Decade I"), Decade, S.A.C. II, LLC ("Decade II"), and Decade, S.A.C. III, LLC ("Decade III"), Decade,

S.A.C. Executives, LLC ("Decade Executives") (collectively, "Decade"), Christopher Aden ("Aden"), and Dorsey James ("James") (collectively, "Cross Defendants"):

1.      This claim arises from Decade's purported purchase of two sports agencies owned by the Goodwins.

2.      Over the course of several negotiations, the Goodwins, Aden, and James reached agreement on terms under which the Goodwins would sell their sports agencies to entities controlled by Aden and James.

3.      Unbeknownst to the Goodwins, when the time came to sign the agreement, Aden, James, and Decade had replaced the agreed-to contract with another contract that contained terms that were entirely unfavorable to the Goodwins and to which the Goodwins never would have agreed.

4.      Aden, James, and Decade made material misrepresentations to the Goodwins such that there was never any valid agreement among the Goodwins and Decade.

5.      Even if there were a valid agreement, Cross Defendants have failed to fulfill their obligations under that agreement, including by failing to make payments to the Goodwins, failing to pay the salaries of the Goodwins and their employees, and failing to pay expenses owed to the Goodwins.   The Goodwins have suffered damages as a direct result of Cross Defendants' actions.

## THE PARTIES

6.      Aaron Goodwin is a citizen and resident of the state of California.

7.      Eric Goodwin is a citizen and resident of the state of Washington.

8.     Upon information and belief, Defendant Decade, S.A.C., LLC is a Delaware limited liability company with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Gotham.

9.     Upon information and belief, Defendant Decade, S.A.C. Contracts, LLC is a Delaware limited liability company with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Decade, S.A.C.

10.     Upon information and belief, Defendant Decade, S.A.C. I, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is 51%-owned by Defendant Decade, S.A.C. and 49%-owned by SMP, Sports LLC ("SMP"), a California limited liability company with its only place of business in California.   Upon information and belief, David K. Stewart, a citizen and resident only of California, is the sole beneficial owner of SMP.

11.     Upon information and belief, Defendant Decade, S.A.C. II, LLC is a Delaware limited liability company with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Decade, S.A.C.

12.     Upon information and belief, Defendant Decade, S.A.C. III, LLC is a Delaware limited liability company with a principal place of business in New York, New York, and is 51%-owned by Defendant Decade, S.A.C. and 49%-owned by Encore Sports and Entertainment LLC, a California limited liability company with its only place of business in California.   Upon information and belief, Kevin Cahill, a citizen and resident only of California, and Christopher Stuart, a citizen and resident only of California, are the two beneficial owners of Encore Sports and Entertainment LLC.

13. Upon information and belief, Defendant Decade, S.A.C. Executives, LLC is a Delaware limited liability company with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant Decade, S.A.C.

14. Upon information and belief, Defendant Christopher Aden ("Aden") is a citizen and resident of New Jersey and an executive of Defendant Decade, S.A.C., and the holder of a 100% membership interest in Jones Sanders Partnership II, LLC.

15. Upon information and belief, Defendant Dorsey James ("James") is a citizen and resident only of New Jersey, an executive of Defendant Decade, S.A.C., and the holder of a 100% membership interest in DES III & Associates, LLC.

## JURISDICTION

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest and pursuant to Federal Rule of Civil Procedure 13.

## FACTUAL ALLEGATIONS

17. The Goodwins have been successful National Basketball Association ("NBA") player agents for almost 30 years.

18. In 1993, Eric Goodwin formed Goodwin Sports Management, Inc. ("GSM"), a Washington corporation. GSM is the entity through which the Goodwins manage athletes' endorsement contracts. Aaron Goodwin formed Goodwin Associates Management Enterprises, Inc., a California corporation ("GAME").

19. Together the Goodwins have represented more than 60 current or former NBA players.

20.     As sports agents, the Goodwins broker employment and endorsement contracts on behalf of their clients.  The Goodwins broker these contracts pursuant to separate marketing representation agreements with their clients.

21.     Under the terms of the Goodwins' agreements with their clients, the Goodwins receive periodic commission payments when their clients receive salary and/or endorsement payments.

22.     As of February 2016, the value of the Goodwins' and their related entities' rights to commissions from their current and former players NBA and endorsement contracts was approximately $30 million.

**A. Aborted Transaction with Stealth**

23.     In or around April or May 2014, James approached Aaron to be a part of a sports and entertainment company that James called Stealth SME ("Stealth").

24.     On or about May 4, 2014, James and Aaron met and discussed the opportunity to sell a percentage of GAME and GSM to Stealth.

25.     At the May 4, 2014 meeting, James proposed that Stealth would buy the existing business by valuing GAME's and GSM's receivables and overall value and that Stealth and the Goodwins would split any future business that the Goodwins generated.  James proposed a 50/50 split of any future business, but Aaron made clear that he would not agree to anything less than a 60/40 split.

26.     After the May 4, 2014 meeting, Aaron sent James a schedule of GAME's and GSM's receivables and projected income from their then-current clients.

27.     Approximately two or three weeks later, Aaron reached out to James, who told Aaron that the relationship would not work and that his partners did not see the relationship as a good fit.

28.     Several months later, Aaron received a call from James, during which James stated that he needed the Goodwins' business to be the front and center business for Stealth.

29.     According to James, over the course of the prior year, Stealth had partnered with several agencies, and it was not working out as they had hoped.

30.     In or about July 2014, the Goodwins and Stealth began to discuss a deal.

31.     At all times during these discussions, it was clear that Stealth was to buy 100% of the old receivables and then split the new revenue with the Goodwins, with 60 percent to the Goodwins and 40 percent to Stealth on the Goodwins' key clients.  All other new clients were to be split on a 50/50 basis.

32.     The Goodwins received the first offer from Stealth in or about September of 2014 and started negotiations.   At this time, there was no mention of any third party financial companies, and at all times it was understood that the Goodwins were dealing directly with Stealth.

33.     Throughout the negotiations, the Goodwins maintained the same position on the deal and the terms of the deal.

34.     At no time did the Goodwins ever agree to send commission payments to Stealth, Decade, or any third party and then wait for them to send the Goodwins' percentage back.

35.     During the September 2014 negotiations, Aaron explained to James and Aden that he would never put his employees and partner in a position where they could not pay their bills

and take care of their families because the Goodwins had entrusted their hard-earned money to someone else's control.

36.     After months of negotiating with Stealth, where the Goodwins were represented by the law firm Perkins Coie LLP, the Goodwins and Stealth came to an agreement in January 2015 (the "Stealth Agreement").

37.     Under the terms of the Stealth Agreement, the Goodwins would receive $35,000,000 in a purchase price to be paid over a 6-year term and a specified amount to be paid in salary and expenses.  The agreement specifically stated that the Goodwins would receive (i) 60% of the revenue of all business from DeMar DeRozan and Damian Lillard, (ii) 50% of all new business from all other clients, (iii) 100% of any receivables that the Goodwins would recover from Kevin Durant, and (iv) 100% of all royalties from the endorsements deals.

38.     The Stealth Agreement also stated that if Stealth failed to make any required payment and could not cure the breach in a certain amount of time (45 days), the Goodwins had the right to terminate the deal, and walk away free and clean and revert back to doing business on their own.

39.     These terms were consistent throughout the partnership between the Goodwins and Stealth and have never been changed by either the Goodwins or their lawyers at Perkins Coie.

40.     In or around June of 2015, James and Aden told Aaron that they thought that they could move the deal along and get something signed.

41.     The Goodwins agreed to re-engage with Stealth if they signed a new letter of intent and agreed to (i) increase the split from 60/40 to 62.5/37.5, (ii) pay $70,000 per month to assist with expenses related to GAME and GSM, and (iii) pay half of the money ($36,000) that

was owed to Perkins Coie.  Although they agreed, Stealth eventually only paid the initial month and never paid Perkins Coie's fees.

### B. Transaction with Decade

42.     Later in 2015, James and Aden told Aaron Goodwin that they had a new equity partner that wanted to be a part of the business and that the deal would get closed.

43.     James and Aden represented that this new equity partner could actually buy them out completely, but they wanted to remain the majority owners.

44.     Aden stated that for James and Aden to remain majority owners, the Goodwins needed to agree to reduce the first payment from Decade to the Goodwins to around $9,000,000 dollars.

45.     In the first proposals, the amount of the first payment to the Goodwins was $20,000,000.  This amount was subsequently reduced - first to $18,000,000, then to $15,000,000, and finally to $12,000,000.

46.     Aden told the Goodwins that the amount of the first payment to the Goodwins needed to be reduced to create cash flow and to allow the new equity partner to be more comfortable.

47.     Aden also asked the Goodwins to be patient on the payment structure for the next 5 years.

48.     After some negotiations, the Goodwins agreed to a new structure where they would be paid $9,500,000 upon execution of the deal.  The remaining $25.5 million would be paid over five years.

49.     During the negotiations, the Goodwins and Decade discussed the fact that when they agreed to the original terms in 2014, there was more value with the old contracts prior to the actual agreement.

50.     Despite these changes to the value of the contracts, Decade, Aden, and James agreed to move forward with the deal and to "figure it out."

51.     Eventually, the Goodwins were informed that XXIII was the proposed "equity" partner.

52.     On or about November 4, 2015, Aaron received an email from Aden mentioning XXIII and attaching a term sheet.

53.     In February 2016, Aden informed Aaron that he and Eric needed to sign new signature blocks to be attached to the Stealth Agreement because the payment schedule had changed and the name had changed from Stealth to Decade.

54.     Aaron specifically asked Aden whether all of the terms that were negotiated for the Goodwins by Perkins Coie with respect to the Stealth Agreement were present in the new agreement (the "Decade Agreement"), and that the only changes made were to the names of the entities and the payment terms.  Aden confirmed this in a text to Aaron on February 10, 2016.

55.     On February 11, 2016, Aden sent Aaron the signature pages.  Aden did not send Aaron the full Decade Agreement.

56.     With Aden's assurances that only the names and payment terms had changed, Aaron signed and returned the signature pages.

57.     After receiving the signature blocks via email on February 11, 2016, and in response to Aaron's direct question regarding whether these were the same documents as the

Stealth Agreement, Aden forwarded Aaron the term sheets from November 2015 via email at 8:48 a.m. on February 12, 2016.

58.    Over the next couple of weeks, Aaron made several inquiries as to the status of the deal, but received no reply.

59.    When Aaron pressed for an explanation, Aden told Aaron that one of the other sports agencies Decade was supposedly acquiring (Encore) was having some problems with some language in the deal.  Specifically, Aden said that Encore did not want to put their money in a "lockbox," to be controlled by Decade.

60.    Aaron later spoke with the partners of Encore and assured them that he had not and would never agree to a lockbox, and that they should not either.

61.    Aaron conveyed the same message to Dave Stewart, and later to Jerome Stanley, other agents who Decade was trying to acquire.

62.    Soon thereafter, Aden asked the Goodwins for wire instructions because the deal was going to close.

63.    On February 23, 2016, the Goodwins finally received the wire for their share of the $9.5 million initial purchase price payment.

64.    The Goodwins noticed that the funds were wired to the Goodwins from XXIII directly, and not from Decade.

65.    When the Goodwins asked Aden why the funds had come from XXIII, he replied that it was quicker to have XXIII Capital pay us directly.

**C.  Post-Closing Activity**

66.    Following the closing of the deal with Decade, the Goodwins immediately began to fulfill their obligations under their agreement with Decade.

67.     Upon receiving any payments, the Goodwins paid Decade the 37.5% and the 50% that they were entitled to, depending on the source of the revenue.

68.     On occasion, the Goodwins had to make payments involved in the recruiting of athletes.  These payments were not subtracted from what the Goodwins remitted to Decade, even though Decade was required to reimburse the Goodwins for such costs.

69.     Decade consistently acknowledged receipt of any money received from the Goodwins and never raised any questions or concerns about the amount of monies that it received from the Goodwins.

70.     The Goodwins paid Decade over $1.6 million, which was Decade's percentage of the applicable receivables.

71.     Around July or August of 2016, the Goodwins were notified that Decade was having some problems with XXIII Capital and that they were moving away from them.

72.     Also around July or August of 2016, Decade requested that the Goodwins advance them funds, including funds to assist the football program.

73.     The Goodwins willingly sent money to Decade as requested, in an to attempt to assist the company grow.

74.     Beginning in November 2016, Decade stopped paying Aaron's salary and delayed salary payment to other employees of GAME and GSM.

75.     On or about November 2016, James told Aaron that Matt Spiro wanted to speak with Aaron.

76.     According to James, Spiro was with a group called Candlewood and that he worked with, and was the money behind, XXIII Capital.

77.     Aaron called Spiro who told Aaron that the Goodwins were required to pay some money directly to XXIII, rather than to Decade.

78.     Spiro also told Aaron that the Goodwins were behind in payments and that they needed to "catch up."

79.     Aaron responded that the Goodwins did not have a relationship with XXIII and that their relationship was with Decade.  Aaron stated that the Goodwins had paid Decade the percentage that was owed to Decade.

80.     Following the call with Spiro, Aaron called James and Aden to relate the conversation.  James and Aden told Aaron not to worry about it, as "you are not on the loan."

81.     Confused by what was going on, Aaron asked them to send him a copy of the full agreement.

82.     In December 2016, Aaron noticed that the agreement with Decade contained considerable changes from the Stealth Agreement.

83.     Among the changes to the Decade Agreement were provisions regarding working with XXIII as a lender and placing money in a "lockbox" controlled by Decade, both of which the Goodwins consistently had been against.

84.     The Goodwins remained unaware of the extent changes to the Decade Agreement until December 2016 when they asked their law firm, Perkins Coie, to compare the Decade Agreement to the Stealth Agreement.

85.     Perkins Coie's review revealed numerous substantive changes, typos, and wrong names.   Almost all of the substantive changes removed terms that were favorable to the Goodwins.

86.     Perkins Coie promptly alerted Decade and its attorneys of the problem.

87.     Aaron confronted Aden and James about the substantial changes to the Decade Agreement.

88.     Aden and James later admitted that the Decade Agreement they provided to Aaron on December 1, 2016 was not consistent with the original Stealth Agreement.

89.     Aden and James repeatedly assured the Goodwins that XXIII knew that the terms in the Decade Agreement were a mistake.

90.     In February of 2017, Aaron was asked to meet with Scott Gold, who was with the new firm, Arena Finance Company, Inc., that was taking over for XXIII.

91.     Aaron met Scott Gold ("Gold") in New Orleans for the NBA All Star game, almost a year to the day after the agreement with Decade.

92.     During the meeting, Aaron told Gold that he would only do a deal if it involved Decade and that he would only pay Decade the percentage that the Goodwins agreed to in the Stealth Agreement (62.5% of DeMar DeRozan and Damon Lillard, and 50% of all others new and old clients).

93.     In April of 2017, XXIII sent a letter out to some of the Goodwins' clients and to a prospective client that the Goodwins were trying to recruit stating that all payments should be directed to XXIII Capital directly.   The letters were signed by Jason Traub ("Traub").

94.     The letter was untrue and put the Goodwins in a negative position with one of the top young NBA players in the league.

95.     Aaron promptly notified Aden and James of the letter and they said that they were not aware of letter and that they would notify XXIII Capital that they did not have the right to contact the Goodwins' clients and prospective clients.

96.     On April 12, 2017, Aaron spoke to Traub via telephone.   During this conversation, Traub told Aaron that he was in possession of documents that the Goodwins had signed with XIII.   Aaron told Traub that he was mistaken, and that he should speak to Decade.

97.     During the same conversation, Traub told Aaron that the Goodwins were required to send the entirety of their commission payments to Decade, and that the Goodwins would only get some back of the commission payments back if there was a profit and XXII was paid.

98.     Aaron informed Traub that the Goodwins had negotiated with Decade to pay a certain percentage to Decade, which the Goodwins had been doing and would continue to do.

99.     Traub was surprised that the Goodwins had been paying Decade and suggested that the Goodwins and XXIII consider joint action against Decade.

100.     Aaron informed Traub that he had never signed any agreements with XXIII and that XXIII was relying on a fraudulent contract that the Goodwins never signed and that Decade was fully aware that the contract was not the one to which the Goodwins had agreed.   Traub replied that he understood and would deal directly with Decade.

101.     The Goodwins did not need XXIII or Decade to get a loan and never would have knowingly transferred and allowed the pledging of their contracts.

**D.  Non-Payment by Decade**

102.     GAME and GSM have an annual payroll of approximately $400,000 for support staff.

103.     Aaron has personally been making payroll payments for GAME and GSM, even though Decade is required to pay most or all of these expenses under the agreements.

104.     Further, the Goodwins have received no payments under the Promissory Note, including the payment of $3,500,000 that was due February 22, 2017.

105.    In addition to other payments made to Decade, since February 2016, the Goodwins have made payments to Decade consistent with their understanding of the obligations of the agreement totaling over $1.6 million.  These include the following:

a)  4/8/16  -  $100,000.00
b)  5/17/16 - $345,000.00
c)  6/14/16 - $200,000.00
d)  8/29/16 - $262,012.17
e)  10/17/16 - $99,500
f)  12/1/16 - $99,500
g)  12/2/16 - $99,500
h)  12/20/16  - $230,000.00
i)  1/09/17 - $66,000.00
j)  2/28/17 - $91,000.00
k)  3/31/17 - $84,000.00
l)  5/1/17 - $71,000.00

106.    The Goodwins have consistently fulfilled their obligations under the agreement with Decade as they understand them.

### FIRST CAUSE OF ACTION
**(Fraud)**

107.    The Goodwins repeat the allegations above as if fully set forth herein.

108.    In 2015, the Goodwins engaged in negotiations with Aden, James, and Stealth to reach agreement on terms under which the Goodwins would sell their shares in GAME and GSM to Stealth.

109.    Despite the fact that the Goodwins and Stealth reached agreement on the terms, Stealth, Aden, and James never signed the Stealth Agreement.

110.    In November 2015, Aden contacted Aaron and informed him that Aden and James were ready to go forward with a new deal with XXIII as an equity partner and with Decade as the entity to which the Goodwins would sell their shares in GAME and GSM.

111.    The Goodwins, Aden, James, and Stealth negotiated new payment terms under the Decade Agreement, but agreed that the remaining terms would remain the same as the terms in the Stealth Agreement.

112.    In February 2016, Aden again contacted Aaron and asked him to send signature pages for the Decade Agreement because the payment schedule had changed and the name had changed from Stealth to Decade.

113.    Aaron specifically asked Aden whether all of the terms that were negotiated for the Goodwins by Perkins Coie with respect to the Stealth Agreement were the present in the Decade Agreement and that the only changes made were to the names of the entities and the payment terms.  Aden confirmed this in a text to Aaron on February 10, 2016.

114.    After receiving the signature blocks via email on February 11, 2016, and in response to Aaron's direct question regarding whether these were the same documents as the Stealth Agreement, Aden forwarded Aaron the term sheets from November 2015 via email at 8:48 a.m. on February 12, 2016.

115.    Aden's representations that the terms and documents were the same was a material misrepresentation of fact, as the documents contained significant substantive changes from the Stealth Agreement.

116.    Aden, James, and Decade intentionally sent the Goodwins the term sheets from the Stealth Agreement despite knowing that the terms had changed in the Decade Agreement.

117.    The Goodwins reasonably relied on Cross-Defendants' repeated assurances that the terms of the Decade Agreement were exactly the same as the terms of the Stealth Agreement.

118.    As a direct result of Cross-Defendants' actions, there was no meeting of the minds, and the Decade Agreement is invalid and unenforceable.

## SECOND CAUSE OF ACTION
### (Fraud in the Execution)

119.     The Goodwins repeat the allegations above as if fully set forth herein.

120.     In 2015, the Goodwins engaged in negotiations with Aden, James, and Stealth to reach agreement on terms under which the Goodwins would sell their shares in GAME and GSM to Stealth.

121.     Despite the fact that the Goodwins and Stealth reached agreement on the terms, Stealth, Aden, and James never signed the Stealth Agreement.

122.     In November 2015, Aden contacted Aaron and informed him that Aden and James were ready to go forward with a new deal with XXIII as an equity partner and with Decade as the entity to which the Goodwins would sell their shares in GAME and GSM.

123.     The Goodwins, Aden, James, and Stealth negotiated new payment terms under the Decade Agreement, but agreed that the remaining terms would remain the same as the terms in the Stealth Agreement.

124.     In February 2016, Aden again contacted Aaron and asked him to send signature pages for the Decade Agreement because the payment schedule had changed and the name had changed from Stealth to Decade.

125.     Aaron specifically asked Aden whether all of the terms that were negotiated for the Goodwins by Perkins Coie with respect to the Stealth Agreement were present in the Decade Agreement and that the only changes made were to the names of the entities and the payment terms.  Aden confirmed this in a text to Aaron on February 10, 2016.

126.     After receiving the signature blocks via email on February 11, 2016, the Cross-Defendants intentionally substituted the Decade Agreement, which was a materially different

agreement from that which the Goodwins believed they had signed, before Stealth executed the Agreement.

127.    The Goodwins never would have entered into the Decade Agreement if they were aware of the actual terms of that agreement.

128.    The Goodwins reasonably relied on Cross-Defendants' repeated assurances that the terms of the Decade Agreement were exactly the same as the terms of the Stealth Agreement.

129.    As a direct result of Cross-Defendants' actions, there was no meeting of the minds, and the Decade Agreement is invalid and unenforceable.

## THIRD CAUSE OF ACTION
### (Fraudulent Inducement)

130.    The Goodwins repeat the allegations above as if fully set forth herein.

131.    In 2015, the Goodwins engaged in negotiations with Aden, James, and Stealth to reach agreement on terms under which the Goodwins would sell their shares in GAME and GSM to Stealth.

132.    Despite the fact that the Goodwins and Stealth reached agreement on the terms, Stealth, Aden, and James never signed the Stealth Agreement.

133.    In November 2015, Aden contacted Aaron and informed him that Aden and James were ready to go forward with a new deal with XXIII as an equity partner and with Decade as the entity to which the Goodwins would sell their shares in GAME and GSM.

134.    The Goodwins, Aden, James, and Stealth negotiated new payment terms under the Decade Agreement, but agreed that the remaining terms would remain the same as the terms in the Stealth Agreement.

135.    In February 2016, Aden again contacted Aaron and asked him to send signature pages for the Decade Agreement because the payment schedule had changed and the name had changed from Stealth to Decade.

136.    Aaron specifically asked Aden whether all of the terms that were negotiated for the Goodwins by Perkins Coie with respect to the Stealth Agreement were present in the Decade Agreement and that the only changes made were to the names of the entities and the payment terms.  Aden confirmed this in a text to Aaron on February 10, 2016.

137.    After receiving the signature blocks via email on February 11, 2016, and in response to Aaron's direct question regarding whether these were the same documents as the Stealth Agreement, Aden forwarded Aaron the term sheets from November 2015 via email at 8:48 a.m. on February 12, 2016.

138.    Aden's representations that the terms and documents were the same were a material misrepresentation of fact, as the documents contained significant substantive changes from the Stealth Agreement.

139.    Aden, James, and Decade intentionally sent the Goodwins the term sheets from the Stealth Agreement despite knowing that the terms had changed in the Decade Agreement for the direct purpose of inducing them to enter into the Decade Agreement.

140.    The Goodwins never would have entered into the Decade Agreement if they were aware of the actual terms of that agreement.

141.    The Goodwins reasonably relied on Cross-Defendants' repeated assurances that the terms of the Decade Agreement were exactly the same as the terms of the Stealth Agreement.

142.    As a direct result of Cross-Defendants' actions, there was no meeting of the minds, and the Decade Agreement is invalid and unenforceable.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)
### (Alternative Cause of Action)

143.     The Goodwins repeat the allegations above as if fully set forth herein.

144.     The Goodwins and Decade are parties to the Decade Agreement, which is a valid contract.

145.     The Goodwins have fully performed their obligations under the Decade Agreement.

146.     Decade has breached its obligations under the Decade Agreement by failing to pay salaries for Aaron Goodwin, Eric Goodwin, and other employees of GAME and GSM, by failing to pay expenses for GAME and GSM, and by failing to make any payments to the Goodwins under the Promissory Note, including the payment of $3,500,000 that was due February 22, 2017.

147.     Decade has further breached its obligations under the Decade Agreement by failing to repay Goodwins for funds advanced to Decade.

148.     As a direct and proximate result of Stealth's breach, the Goodwins have been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Alternative Cause of Action)

149.     The Goodwins repeat the allegations above as if fully set forth herein.

150.     The Goodwins' contracts with their clients are worth at least $30 million.

151.     To date, the Goodwins have received approximately $9.5 million from Decade for the purchase of GAME and GSM, which includes the value of the contracts.

152.     Decade has been enriched by its improper and unauthorized retention of the purchase price of GAME and GSM.

153.    Decade has been unjustly enriched at the Goodwins' expense at least to the extent that Decade has profited the Goodwins' contracts with their clients without providing compensation to the Goodwins.

154.    In equity and good conscience, it would be unjust to allow Decade to retain the profits it has received through the Goodwins' contracts.

155.    Decade is liable to the Goodwins for an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Cross-Plaintiffs Aaron and Eric Goodwin respectfully demand judgment against Cross-Defendants Decade, Aden, and James as follows:

A.  Declaring that the Decade Agreement is invalid and unenforceable;

B.  Awarding the Goodwins damages, as well as punitive damages, in an amount to be proven at trial; and

C.  Granting any such other relief as the Court deems appropriate and proper.

Dated:  New York, New York                     Respectfully submitted,
        October 20, 2017


                                  By:  */s/ Keith W. Miller*
                                       Keith W. Miller, Bar No. 2421717
                                       Perkins Coie LLP
                                       30 Rockefeller Plaza, 22nd Floor
                                       New York, NY 10112-0085
                                       212.262.6900
                                       keithmiller@perkinscoie.com

                                       *Attorneys for Defendants Aaron and Eric Goodwin*