USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/13/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
    XXIII CAPITAL LIMITED,

                                  Plaintiffs,

                  -against-

    DECADE, S.A.C., LLC, DECADE, S.A.C.
    CONTRACTS, LLC, DECADE, S.A.C. I, LLC,
    DECADE, S.A.C. II, LLC, DECADE, S.A.C. III,
    LLC, GOODWIN ASSOCIATES
    MANAGEMENT ENTERPRISES, INC.,
    GOODWIN SPORTS MANAGEMENT, INC.,
    DECADE, S.A.C. EXECUTIVES, LLC,
    GOTHAN S&E HOLDINGS, LLC,
    CHRISTOPHER ADEN, DORSEY JAMES,
    AARON GOODWIN, and ERIC GOODWIN,

                                 Defendants.
------------------------------------------------------------- X

1:17-cv-6910-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, District Judge:

## I. INTRODUCTION

    2016 was a big year for Christopher Aden and Dorsey James. In February 2016 both men were managers of Decade, S.A.C., LLC, which, together with a number of affiliated entities, was about to enter into a multi-million dollar transaction to buy a sports management business with a roster of NBA stars as clients. The Court assumes that at the time that Mr. Aden and Mr. James personally guaranteed the acquisition debt incurred to purchase the business, they had every expectation that the transaction would go well for them and their companies. It did not. Decade S.A.C., LLC and its sister companies have failed to pay their debt when due; a number of the companies are already bankrupt. Now Mr. Aden and Mr. James confront their lender's claims under their personal guarantee of the loans. Because their guarantees were absolute and unconditional,

they are liable for their companies' borrowings, and their lender's request for entry of summary judgment is GRANTED.

## II. BACKGROUND

From late 2015 through early 2016, Decade, S.A.C., LLC worked to finance the acquisition of a number of sports agencies. Declaration of Jason Traub, Dkt. No. 248 ("Traub Decl.") ¶ 7; Declaration of Christopher Aden, Dkt. No. 284 ("Aden Decl.") ¶¶ 2, 4. Mr. Aden and Mr. James were the managers of the company and of a number of its subsidiaries. Traub Decl. Ex. A (the "Loan Agreement"), at 73.

In order to finance those acquisitions, Plaintiff XXIII Capital Limited ("XXIII") entered into a Loan, Guaranty and Security Agreement, dated as of February 22, 2016, with Decade, S.A.C., LLC, Decade, S.A.C. Contracts, LLC, Decade, S.A.C. I, LLC, Decade, S.A.C. II, LLC, Decade, S.A.C. III, LLC, Goodwin Associates Management Enterprises, Inc., and Goodwin Sports Management Inc. (collectively "Borrowers") as borrowers, and Decade, S.A.C. Executives, LLC ("Decade Executives"), Gotham S&E Holdings, LLC ("Gotham;" together with Decade Executives, the "Corporate Guarantors") and Messrs. Aden and James (collectively, the "Personal Guarantors, and together with the Corporate Guarantors, the "Guarantors") as guarantors. Loan Agreement at 1.

The Loan Agreement established a payment schedule for the principal amounts due with respect to the loans. Loan Agreement § 2.2. In addition, the Loan Agreement required the payment of a specified prepayment fee due at the time of any prepayment of the loans. *Id.* § 2.2(c). Under the terms of the Loan Agreement, interest accrued on advances at a rate of LIBOR plus 12.5%. *Id.* § 2.4(a). However, pursuant to the terms of the Loan Agreement, that rate increased by five percent "if any principal of or interest on any Loan . . . hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise . . . ." *Id.* § 2.4(e).

As is customary in such agreements, the Loan Agreement contains a number of affirmative and negative covenants, as well as a series of events of default. Among the events of default under the Loan Agreement is the failure by any "Loan Party" to make payment of principal when due or payment of interest or other amounts within three business days following the date on which it was due. Loan Agreement § 10.1(a). Upon the occurrence of that, or any other event of default, XXIII as lender, has the authority to "accelerate" the obligations under the Loan Agreement—in other words, to require the immediate payment of all of the obligations under the Loan Agreement. *Id.* § 10.8(a).

The Loan Agreement obligates the Borrowers and Corporate Guarantors to pay all of the reasonable out of pocket fees and expenses of XXIII in connection with its administration of the Loan Agreement. Loan Agreement § 13.3. That obligation expressly captures fees and expenses incurred in connection with collection efforts, or the protection of the lender's rights under the Loan Agreement, through litigation or otherwise. *Id.*

Pursuant to the terms of the Loan Agreement, each of the Borrowers is jointly liable for the full amount of all obligations under the Loan Agreement. *Id.* §§ 2.13, 13.16. In addition, all obligations of the Borrowers under the Loan Agreement are guaranteed by the Guarantors, including the so-called "Personal Guarantors," Messrs. Aden and James. *Id.* §§ 2.13, 14.1

The terms of the guarantee agreed to by Messrs. Aden and James are spelled out clearly in Section 14 of the Loan Agreement. The scope of the obligations guaranteed is broad. The guarantee encompasses all "Obligations" as defined in the Loan Agreement. Loan Agreement § 14.1. The guaranteed "Obligations" include "all Loans and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by the Loan Parties and the Personal Guarantors to Lender . . . that arises under any Loan Document . . . ." Loan Agreement at 15.

3

Several provisions of the Loan Agreement related to their guarantee are worthy of particular note here. The guarantee is stated to be "absolute and unconditional" and encompasses all of the obligations under the Loan Agreement. Section 14.1 of the Loan Agreement states:

> Each Guarantor hereby agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Lender, the prompt payment when due, whether at state maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all reasonable costs and expenses including, without limitation, all court costs and reasonable attorneys' fees (including allocated costs of in-house counsel) and expenses paid or incurred by Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Secured Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

Loan Agreement § 14.1.

Moreover, the Loan Agreement contains extensive provisions emphasizing the absolute and unconditional nature of the guarantee, and waiving any defense associated with performance of the guarantee. For example Section 14.3 of the Loan Agreement reads:

> (a) Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, Lender or any other Person, whether in connection herewith or in any unrelated transactions.

> (b) The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

> (c) Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

Loan Agreement § 14.3.

And Section 14.4 of the Loan Agreement contains an express waiver of additional defenses, including the following:

> To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations.

*Id.* § 14.4.

Messrs. James and Aden were represented by counsel in connection with the Loan Agreement and related transactions. Aden Decl. ¶ 14. Both Mr. James and Mr. Aden signed the Loan Agreement not only in their capacity as managers of the various corporate borrowers and guarantors but also in their individual capacity under a separate heading that listed them as "Personal Guarantors" of the loans. Loan Agreement at 73-74. As guarantors, Mr. Aden and Mr. James each expressly acknowledged his liability under the guarantee, and assumed "all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations." *Id.* § 14.7; *see also id.* § 14.1.

The Loan Agreement is governed by New York law. *Id.* § 13.7. The agreement contains a comprehensive integration clause, which states, among other things that "[a]ny letter of interest, commitment letter, fee letter or confidentiality agreement, if any, between any Loan Party and Lender or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement." *Id.* § 13.1.

Between February 23, 2016 and August 2016, XXIII advanced a total of $15,446,033.20 to the Borrowers or to others on their behalf. XXIII's Reply 56.1 Statement of Undisputed Facts, Dkt. No. 288 ("Reply 56.1 Statement), ¶ 22.[1] On December 7, 2016, XXIII sent Decade a default notice to inform it of the occurrence of a number of events of default under the Loan Agreement. Reply 56.1 Statement ¶ 47. The Borrowers later failed to pay the interest payment due on March 15, 2017. *Id.* ¶ 43. As a result of the undisputed payment default and the other defaults asserted by XXIII, on March 17, 2017, XXIII accelerated the indebtedness owed under the Loan Agreement. *Id.* ¶ 48. No further payments have been made in respect of the obligations owing under the Loan Agreement. *Id.* ¶ 49. As a result, as of June 29, 2018, $25,813,306.85 was due and owing under the Loan Agreement, consisting of $16,000,000 in principal amount, $581,706 in accrued interest as of March 21, 2017; $3,821,921.80 in default interest calculated from March 21, 2017 through June 29, 2018; a $4,000,000 pre-payment fee due pursuant to Section 2.2(c) of the Loan Agreement, plus fees and costs incurred by the lender in connection with its enforcement efforts in the amount of $1,409,679.05. *Id.* ¶ 50.[2]

---

[1] The Court cites to the Reply 56.1 statement of facts, but only does so to the extent that the fact is uncontroverted. The citation to the reply statement incorporates Messrs. Aden and James' response.

[2] Messrs. Aden and James deny XXIII's statement regarding the amount outstanding with the following comment: "Aden and James must complete further research to determine and confirm the appropriate LIBOR Rates and at this time cannot make a determination as to the accuracy and/or appropriateness of the Fees and Costs stated by XXIII." Reply 56.1 Statement ¶ 50. However, as XXIII points out, this response does not raise a genuine issue of material fact with respect to the statement. First, the statement takes no issue with any component of the amount owing other than the interest rate and legal fees. Second, with respect to the interest rate utilized, Messrs. Aden and James present no evidence that the information is incorrect; rather they ask for more time to determine what the LIBOR rate was during the relevant periods. This does not raise a material issue of fact. Nor does their denial raise an issue of fact with respect

Mr. Aden and Mr. James point to a series of events involving an insurance policy as a justification for their request that the Court either deny or to delay entry of judgment against them here. Their argument fails for a number of reasons, but the Court lays out the basic facts related to that insurance contract as set forth by Mr. Aden.

During the early period of negotiations in connection with the Loan Agreement, Mr. Traub, a representative of XXIII, "raised the issue of obtaining insurance coverage on the players' management and marketing contracts . . . which would become Decade's principal assets when the deal closed." Aden Decl. ¶ 7. The requirement that the borrower obtain such insurance was a significant deal point for the lender: "On November 24, 2015, Traub emailed Aden to say that he wasn't sure negotiations could move forward until the issue of such insurance was resolved." *Id.* Mr. Traub followed up with Mr. Aden about the status of his efforts to obtain the insurance. *Id.* ¶ 8. Mr. Aden and Mr. James received a quote for such a policy five days later, on November 30, 2015. *Id.* ¶ 9. Mr. Aden asserts in his declaration that "[o]n January 13, 2016, myself [sic] and James received a third Letter of Intent modified from the previous Letter of Intent to include the insurance policy requirement as demand as an essential prerequisite for the deal to close." *Id.* ¶ 12. However, the term sheet to which Mr. Aden refers in support of his assertion does not require insurance as a precondition to the closing. Instead, insurance is listed as one of the "Conditions Subsequent." Aden Decl. Ex. G at 5 ("Conditions [S]ubsequent . . . . 2. All requisite insurances . . . to be maintained and provided on a quarterly basis or as requested by the Lender.").

On January 29, 2016, counsel for Messrs. James and Aden sent Mr. Aden an email summarizing a conversation that he had with counsel for XXIII. Aden Decl. ¶ 14. He wrote that

---

to the billed fees and costs, which have been supported by invoices submitted by Plaintiff's counsel. *See, e.g.*, *Passo v. U.S. Postal Service*, 631 F. Supp. 1017, 1022 (S.D.N.Y. 1986) ("[T]he mere possibility that a factual dispute *may* exist," without affirmative support, does not demonstrate a genuine issue of material fact and is insufficient to defeat summary judgment. (emphasis in original) (citation omitted)). Messrs. Aden and James cannot defer liability on the basis of such factually unsupported conclusory denials.

7

counsel for XXIII "says that it's his understanding that XXIII will obtain 'special insurance' and that Decade will obtain D&O, corporate liability and general insurance. Regarding the insurance Decade obtains, XXIII needs to be named as additional insured." Aden Decl. Ex. I. Messrs. Aden and James agreed with XXIII that $325,000 would be deducted at the closing for the financing. Aden Decl. ¶ 16.

As described above, the financing transaction closed in late February, when the parties entered into the Loan Agreement. *Id.* ¶ 17. Mr. Aden correctly notes that the Loan Agreement contains specific provisions related to obtaining insurance. In his declaration, Mr. Aden points to Section 6.4 of the Loan Agreement, which includes the following requirement: "In addition, each Loan Party shall, and shall cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies, insurance covering against risks associated with income concentration, death, disability, disgrace, lockouts and strikes in connection with Obligors under the Covered Agreements." Loan Agreement § 6.4(a). The "Covered Agreements" to be insured included management agreements entered into with the acquired sports agencies' clients. While Mr. Aden correctly asserts in his declaration that "[a]s a requirement for consummating the overall transaction, specific sports related insurance was to be procured," Mr. Aden's use of the passive voice should not obscure the fact that the Loan Agreement's covenant requires that the Loan Parties—the Borrowers and Corporate Guarantors—obtain that insurance, not XXIII. Aden Decl. ¶ 27.

Moreover, Section 6.4 of the Loan Agreement contains a separate provision related to the insurance policies that is not mentioned in Mr. Aden's declaration: Section 6.4(c) requires the delivery of proof of insurance within 2 business days *after* the closing date for the loan. Loan Agreement § 6.4(c). Delivery of proof of insurance is not included as an express condition precedent to the initial advances under the Loan Agreement. *See* Loan Agreement § 3.1.

8

In March 2016, following the closing under the Loan Agreement, Mr. Aden requested information regarding the status of the insurance policy from XXIII's counsel. Aden Decl. ¶ 28. In his email, Mr. Aden wrote "Per the close XXIII was to provide an all blanket insurance policy for anything outside of the players [sic] contracts and it was costed in the use of proceeds at $325K. . . . The policy that XXIII Capital was to provide provided additional coverage around the athlete fees and I believe it should have been placed prior to or at the close. Just trying to sync up the open items as I don't have a copy of the insurance binder for our records." Aden Decl. Ex. T.

In March 2016, Mr. Aden requested that his counsel confirm the existence of the insurance policy. Aden Decl. ¶ 29. Counsel for XXIII informed Mr. Aden's counsel that the policy had been obtained but that XXIII would not share it with the borrower. Aden Decl. Ex. U. Poignantly, Mr. Aden does not assert that the policy does not exist—only that he has not seen it. Mr. Aden's declaration asserts that the fact $325,000 was deducted from the loan closing proceeds, which in his view "would signify that there is an insurance policy and coverage for the benefit of Decade, Aden and James." Aden Decl. ¶ 30. While the Court appreciates Mr. Aden's suggestion that the evidence supports an inference that an insurance policy was acquired, Mr. Aden does not point to the evidence beyond his subjective belief that supports an inference that such an insurance policy would benefit him or Mr. James personally. The requirement under Section 6.4 required that the Loan Parties—the Borrowers and Corporate Guarantors—obtain the insurance policy, not the individual Personal Guarantors. Nor has Mr. Aden identified what insurable interest he and Mr. James personally held in the Covered Contracts that could be insured.

Mr. Aden asserts categorically that "I can unequivocally state that Dorsey and me [sic] only provided our personal guarantee in return for the specific sports insurance policy that the Decade companies would have." Aden Decl. ¶ 39. However, Mr. Aden points to no provision of the Loan Agreement that suggests that his, or Mr. James' guarantee was contingent on that requirement, and

9

none exists. Instead, they entered into an agreement in which they guaranteed their companies' obligations "absolutely and unconditionally."

### III. PROCEDURAL HISTORY

XXIII filed this case on September 12, 2017. Dkt. No. 1. XXIII brought claims for breach of contract, seeking repayment of the defaulted loan obligations by the Borrowers and the Guarantors. *Id.* Messrs. James and Aden were sued in their individual capacity for the asserted breach of the guarantee which is the basis for this motion. *Id.* In addition, XXIII brought a number of additional common law claims against the Borrowers and Guarantors—including Messrs. Aden and James—including claims for recovery of chattel/replevin and fraud in the inducement. *Id.* XXIII also sued Eric and Aaron Goodwin, whose sports agencies were to be acquired using financing under the Loan Agreement. *Id.*

On February 28, 2018, counsel for the Borrowers and the Guarantors—including Messrs. Aden and James, moved to withdraw as counsel. Dkt. No. 161. Counsel asserted that the Borrowers and Guarantors had failed to comply with the terms of their retainer, and that they had communicated to their counsel that they were unable to satisfy their obligations under the retainer agreement. *Id.* The Court granted the request to withdraw on March 8, 2018, and stayed the case through April 9, 2018 to permit them to retain new counsel. Dkt. No. 169. At the request of Mr. Aden, who represented that Decade had "identified its counsel and is in final conflicts checks," the Court extended the stay for an additional 15 days—to April 24, 2018. Dkt. No. 176. No counsel entered an appearance, however. As a result, on April 25, 2018, the Court lifted the stay, declared the corporate Borrowers and Guarantors to be in default, and put in place a process to permit Messrs. Aden and James to litigate the claims against them *pro se*. Dkt. No. 178.

On July 6, 2018, XXIII moved by order to show cause for entry of a default judgment against the corporate Borrowers and Guarantors. Dkt. No. 250. And on the same date, XXIII filed

10

this motion for summary judgment against Messrs. Aden and James. Dkt. No. 246. Unsurprisingly, on July 18, 2018, the Court was notified that two of the corporate defendants had filed for bankruptcy under chapter 7. Dkt. No. 262. Messrs. Aden and James moved the Court to stay this action as to them as a result of the bankruptcy of those two entities, but the Court denied that motion by order dated August 2, 2018. Dkt. No. 281. Messrs. Aden and James filed their opposition to this motion for summary judgment on August 20, 2018. Dkt. No. 285. Plaintiff's reply was filed on August 28, 2018. Dkt. No. 287.

## IV. DISCUSSSION

### A. Legal Standard

The plaintiff in this case is entitled to summary judgment on a claim if it can show that "there is no genuine dispute as to any material fact and that [defendant is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. at 585-86). The issue of fact must be genuine—plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide whether a rational juror could find in favor of the non-moving party. *Id.*

Because they are proceeding *pro se*, the Court must liberally construe Messrs. Aden and James' submissions and interpret them "to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed' . . . ." (citation omitted)); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was filed *pro se*, it must be construed liberally to raise the strongest arguments it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013))). "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater,* 623 F.3d 90, 101 (2d Cir.2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express,* 766 F.3d 189, 195 (2d Cir.2014); *accord Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

### B. Applicable Law

The Loan Agreement is governed by New York law. Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "The best

evidence of what parties to a written agreement intend is what they say in their writing." *Id.* at 569. (internal quotation marks omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms." *Id.*; *see South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 277 (2005) ("In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." (internal quotation marks omitted)).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *Krumme v. West Point Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). The question of "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) (citation omitted). "It is well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion. Conversely, . . . the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp.*, 639 F.3d at 69 (citations omitted).

"'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)). "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" *W.W.W. Assoc.*, 77 N.Y.2d at 163 (quoting *Intercontinental Planning v Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)). "An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and

13

unsettles the law." *Id.* at 163. "[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract." *Id.* at 162.

"Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract. As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). "Furthermore, where a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" *Id.* (quoting *Matter of Primex Int'l Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 599 (1997)).

It is a clearly established principle that "[a]bsolute and unconditional guaranties . . . [can] preclude guarantors from asserting a broad range of defenses under New York law." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 35 (2d Cir. 1999); *see also First N.Y. Bank for Bus. v. DeMarco*, 130 B.R. 650, 654 (S.D.N.Y. 1991) ("Absolute and unconditional guaranties . . . are consistently upheld by New York courts. Indeed, unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims.") (citations omitted) (quoted in *Merrill Lynch*, 188 F.3d at 36).

### C. The Guarantee is Absolute and Unconditional

Messrs. Aden and James are clearly liable under their guarantee for payment of all outstanding obligations under the Loan Agreement. Messrs. Aden and James entered into an absolute and unconditional guarantee of the obligations under the Loan Agreement. The language of the guarantee could hardly be more clear. As described above, the Guarantors "absolutely and unconditionally" guaranteed the obligations. Loan Agreement § 14.1. Moreover, the Loan Agreement states that the guarantee is "not subject to any reduction, limitation, impairment or termination for any reason . . . ." *Id.* § 14.3. In addition to that clear, broad statement, the Loan

14

Agreement contains the extensive express waivers of defenses quoted above. *Id.* Significantly, as noted below, those express provisions specifically address substantially all of the arguments presented by Messrs. Aden and James in their opposition to this motion.

Messrs. Aden and James express the view that their inability to review the insurance policy obtained by XXIII vitiates their obligation to comply with their guarantee obligations. Their concerns lack merit. The Court highlights that, as noted above, Messrs. Aden and James do not argue that the insurance policy was not obtained—rather, that they have not had the opportunity to review it. Defendants' Memorandum of Law, Dkt. No. 285 (the "Opposition"), at 15. Messrs. Aden and James' submissions suggest that they believe that the failure of XXIII to provide a copy of the insurance contract resulted in a modification of the Loan Agreement. There is no basis for such an argument for several reasons.

First and foremost, the guarantee is absolute and unconditional. It expressly states that "the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by . . . any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations." Loan Agreement § 14.3(c). Therefore, even if there had been a modification to the Guaranteed Obligations, it would not affect the guarantee. Moreover, there is no basis in the record that supports Messrs. Aden and James' subjective belief that a failure by XXIII to provide a copy of the insurance policy is a modification of the Loan Agreement. As noted above, the obligation to obtain insurance was imposed on the Loan Parties—of which Messrs. Aden and James were the managers—not XXIII. The fully-integrated Loan Agreement creates no obligation on the part of XXIII to obtain or to provide Messrs. Aden and James a copy of the insurance contract. Apart from Mr. Aden and Mr. James' conclusory statements, there is no basis for the Court to conclude that XXIII's asserted failure to provide the contract constituted a modification of the Loan Agreement.

Second, in their absolute and unconditional guarantee, Messrs. Aden and James have expressly waived their right to argue that a failure by XXIII to comply with an obligation in connection with the Loan Agreement vitiates their obligation to comply with their obligations under the guarantee. The Loan Agreement states that their guarantee is absolute and unconditional despite "the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, Lender or any other Person, whether in connection herewith or in any unrelated transactions." Loan Agreement § 14.3(a). To the extent that Messrs. Aden and James argue that XXIII has an obligation to provide them with a copy of the insurance contract, and that its failure to do so vitiates their guarantee, their argument must fail in the face of the clear language to the contrary in the guarantee agreement.

Third, Messrs. Aden and James cannot avoid liability on the basis that they expected that XXIII would obtain this insurance and that they relied on its commitment to do so to their detriment. This is true for many reasons. At the outset, in the Loan Agreement, the Guarantors expressly agree that their obligations "are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise . . . ." Loan Agreement § 14.3(b). The language of the guarantee provisions of the Loan Agreement effectively precludes a defense that attacks the enforceability of the guaranteed obligations.

The Court need not look to extrinsic evidence of communications regarding the expectations of Messrs. Aden and James to determine what, if any, conditions were imposed on their guarantee. The Loan Agreement is fully integrated and contains a merger clause. The contract itself is clear, and it does not make their obligations contingent on the procurement of insurance by XXIII. Instead, their guarantee is absolute and unconditional. Moreover, the Loan Agreement places the obligation to obtain insurance on the Loan Parties, not XXIII. The Loan Agreement

16

specifically provides that the procurement of insurance is a condition *subsequent* to the closing of the Loans, undermining the logic of an argument that the absolute and unconditional guarantee was contingent upon the procurement of such insurance—their guarantee came first, and no express condition limited the guarantee. Presented with the clear language of the Loan Agreement, the Court need not consider extrinsic evidence of the parties' expectations, as Messrs. Aden and James suggest. There is no better evidence of the parties' intentions than the unambiguous words of their contract.

The ongoing bankruptcy proceedings involving two of the corporate Decade entities does not justify delaying the entry of judgment in favor of XXIII. Messrs. Aden and James argue that summary judgment should be denied to permit the bankruptcy court to make some unspecified determination regarding the bankrupt entities. Opposition at 15. However, in their absolute and unconditional guarantee, the guarantors have expressly waived any such defense. *See* Loan Agreement § 14.3(a) ("Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including . . . any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party . . . ."). The Court has already ruled that the automatic stay applicable to those two entities does not extend to the claims against Messrs. Aden and James. Dkt. No. 281. Given the clear language of the Loan Agreement, there is no basis for the Court to defer entry of summary judgment in order to await a determination by the bankruptcy court.

There is no need to defer summary judgment to permit further discovery with respect to the issues raised in this motion. Messrs. Aden and James argue that the motion is premature, because

they wish to conduct additional discovery. They cannot invoke Federal Rule of Civil Procedure 56(d) to delay entry of judgment against them here.

A party resisting summary judgment on the ground that it needs additional discovery in order to defeat the motion must submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) (formerly Rule 56(f)), showing: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (quoting *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989)). "[T]he failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994). "A reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit . . . ." *Id.*

Messrs. Aden and James cannot avoid summary judgment on the basis of Rule 56(d). They did not present the affidavit required under the rule; this alone is a sufficient basis for the Court to deny the application. Moreover, the rationale suggested by Messrs. Aden and James for further discovery is not compelling. They assert that they wish to conduct discovery regarding the content of the insurance policy obtained by XXIII because they believe that it should be for their benefit. Opposition at 15. But, as described above, the content of the policy is irrelevant to the question presented here—whether they are liable under the terms of their absolute and unconditional guarantee. Messrs. Aden and James have not presented an affidavit to explain what facts are sought and how they are to be obtained, or how those facts are reasonably expected to create a genuine issue of material fact with respect to the issue raised by this motion. In the absence of a coherent answer to those questions, their suggestion that further discovery is needed before they are required

to pay under their absolute and unconditional guarantee is redolent of a cynical effort to buy time. The Court does not believe that delay in the execution of judgment is warranted under Rule 56(d).

### D. Messrs. Aden and James Are Liable Under their Guarantee

The terms of the Loan Agreement are clear and unambiguous. Messrs. Aden and James each signed the Loan Agreement in his individual capacity as "Personal Guarantors." Their guarantee encompasses all "Obligations" owing under the Loan Agreement. Loan Agreement § 14.1. The guaranteed "Obligations" include the principal amount of the loans, accumulated interest—including default interest, prepayment fees, and reasonable fees and expenses incurred by XXIII in connection with its administration and enforcement of the Loan Agreement.

XXIII accelerated the loans following a payment default. The Borrowers have not satisfied their obligations to repay amounts owing under the Loan Agreement. As a result, as of June 29, 2018, $25,813,306.85 was due and owing under the Loan Agreement, consisting of $16,000,000 in principal amount, $581,706 in accrued interest as of March 21, 2017; $3,821,921.80 in default interest calculated from March 21, 2017 through June 29, 2018; a $4,000,000 pre-payment fee due pursuant to Section 2.2(c) of the Loan Agreement, plus fees and costs incurred by the lender in connection with its enforcement efforts in the amount of $1,409,679.05. These amounts are included within the scope of the guarantee provided by Messrs. Aden and James. They have not satisfied that obligation. XXIII is, therefore entitled to the entry of judgment against Messrs. Aden and James in that amount.

### V. CONCLUSION

For the reasons described above, XXIII is entitled to judgment against each of Mr. Aden and Mr. James in the amount of $25,813,306.85. According to the terms of the Loan Agreement, Mr. Aden and Mr. James are jointly and severally liable for the judgment in that amount. The Clerk

of Court is directed to enter judgment accordingly and to terminate the motion pending at Dkt. No. 246.

SO ORDERED.

Dated: September 13, 2018  
New York, New York

_____  
GREGORY H. WOODS  
United States District Judge